UNITED STATES of America, Plaintiff,

v.

Sydney KLEIN doing business as Standard Real Estate Company, Eugene Spirer and R. Doyne Halbritter, Defendants.

Civ. A. No. 18143.

United States District Court
W. D. Pennsylvania.

April 2, 1964.

Samuel Reich, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Leonard Boreman, Pittsburgh, Pa., for defendant, Sydney Klein and others.

ROSENBERG, District Judge.

## I. INTRODUCTORY STATEMENT

This action was instituted by the United States against defendants, Sydney Klein, doing business as Standard Real Estate Company, Eugene Spirer and R. Doyne Halbritter, under the provisions of § 3490 and § 5438 of the Revised Statutes, 31 U.S.C.A. § 231 of the False Claims Act.[1] The United States main-

---

1. 31 U.S.C.A. § 231 in pertinent part reads as follows: "Liability of persons making false claims. Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into

tains it suffered losses attributable to 25 false claims caused by the defendants and resulting from payments made by the Veterans Administration on guaranteed veterans home loans as authorized under the Servicemen's Readjustment Act of 1944.[2] The loans were secured by mortgages on houses in the town of Bretz, Preston County, West Virginia.

The action against R. Doyne Halbritter, one of the named defendants, was previously dismissed without prejudice because of lack of jurisdiction over the person.[3] No evidence has been produced here against the defendant, Eugene Spirer. Accordingly, judgment will be rendered in favor of Eugene Spirer and against the plaintiff.

As for the defendant, Sydney Klein, a stipulation filed between counsel corrects the record to indicate that Sydney is not trading and doing business as Standard Real Estate Company, but is a member of a partnership which is known as Standard Real Estate Company. Testimony, subsequently developed, indicates that the partnership consisted of the brothers Sydney Klein, Morris Klein, Benjamin Klein, Zola Klein and Samuel Klein, and one Charles Chatkin. Obviously, this action should have been brought against the partnership as such, but it was brought only against Sydney, and neither the partnership nor the individual partners were here made party defendants since it appeared that the Government was unaware of them at the time of the institution of the action.

The town of Bretz consisted of approximately 69 houses, a church, a school, and roads. The town was originally owned by the Bethlehem Steel Corporation which operated a coal mine in the vicinity and provided these houses for its employees as tenants. When the company ceased operation in 1943, it sold the entire town to three joint purchasers. These successor owners or their assigns conveyed the town to Sydney Klein and one Eugene Lebowitz on December 1, 1948 for the consideration of $90,000 as secured by (1) a mortgage from the buyers to the sellers in the sum of $90,000 payable in quarter annual payments each in the sum of $5,000 and (2) a series of 36 notes from the buyers to the sellers, each in the sum of $2,500 and payable consecutively.

After accepting title to the town of Bretz, Klein and Lebowitz affixed exterior wall siding to the houses, repaired porches and repaved the town's roads at a cash expenditure of $56,000. Five of the 69 houses were sold outright for cash prices ranging from $3400 to $5700. The other 64 houses were lease-sold by Agreements of Sale. Individual prospective purchasers-lessees were required to pay such amounts of money as they could—$50, $75 or $100. They were obligated to pay monthly amounts from $50 to $60, depending on the sizes of the houses, for such time as it would take to make up the prices mentioned in the Agreements of Sale, including interest, taxes, etc., or unless paid sooner, when the purchasers would be entitled to receive deeds for the properties. At the end of five months the record shows that 69 houses were sold, five outright, as already stated, and the balance by the agreements, with the result that $33,000 cash was received and accounts receivable remained outstanding in the amount of $215,000. The original Klein-Lebowitz mortgage on the Bretz properties remained.

any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit. R.S. §§ 3490, 5438."

2. 38 U.S.C.A. § 694, now 38 U.S.C.A. §§ 1801(a) (1, 2), 1802(a–f), 1803(a) (1, 2), (b–d).

3. Order dated December 21, 1959.

In July or August 1949, Mortgage Service Corporation (Mortgage Service), a mortgage and real estate brokering firm, entered into negotiations with Klein for the broadening of his investments in behalf of Standard Real Estate Company (Standard). This involved the purchase of the Sunset Heights Realty Corporation, which owned certain real estate in Titusville, Pennsylvania, for the sum of $213,973.54. The transaction required certain financing, and arrangements were made by which the realty in Bretz was tied into the deal. Mortgage Service negotiated a $190,000 mortgage loan for the properties in Bretz. Of these proceeds $61,372.92 was allocated to the retirement of the Klein-Lebowitz mortgage at Bretz and payment of $10,000 was made to Lebowitz. At the same time, Lebowitz conveyed his interest in Bretz to Sydney Klein. The sum of $99,071.95 was applied for the purchase of the Sunset Heights Realty Corporation holdings. The balance of the proceeds, after expenses amounting to $18,176.63, was paid to Sydney and Zola Klein and their wives. This $190,000 mortgage was payable in eight years at the rate of $2,498.50 monthly including principal and interest. Also at the same time, Sydney or Standard assumed a mortgage existing on the Titusville property in the sum of $348,-512.15. The Titusville property had been owned by officers of Mortgage Service which, as well, was the mortgagee of the $190,000 mortgage, and which it assigned to the First Federal Savings & Loan Association of Greene County (First Federal). The negotiation was further complicated by the giving of deeds of trust by Sydney and Zola Klein and their wives.

Early in 1950, it became apparent that the $190,000 mortgage held by First Federal on Bretz was looked upon with disfavor by the banking officials of the Commonwealth of Pennsylvania and inquiries by the bank examiners became imminent. With this in view, Sydney with the officials of both Mortgage Service and First Federal commenced a course of conduct for the purpose of reducing the $190,000

mortgage loan. It was decided that this would be done with proceeds from Veterans Administration guaranteed home loans. This, of course, required that applications for such guaranteed loans be made by veterans; so veterans had to be procured to make the applications. Accordingly, a campaign was initiated by Sydney and his partners to carry out this program. As the result of this campaign those Bretz homes-occupiers who held whatever title by virtue of Agreements of Sale were told that they would not be permitted to stay in the homes any longer unless they procured veterans to buy the homes and make applications for Veterans Administration loans. Where occupiers were unable to do so, the Klein's procured veterans from the outside to become purchasers and to make applications for the Veterans Administration loans. On occasion, a procurer was allowed a fee for getting a veteran applicant. On two occasions, veterans were solicited and applications for loans were brought to them while they were in jail. Veterans were requested to buy homes, not necessarily for themselves but for relatives or others. This program was initiated under the direction of Sydney in the Standard offices at Pittsburgh, but it was carried out in the field (Bretz) primarily by the direct contact of the brother and partner, Sam Klein.

With each application Standard advanced the sum of $20.00 to First Federal for processing the loans. Of this sum, $5.00 was to be applied for the obtaining of a credit report on each applicant. Credit reports evidently were never procured. Supporting each Veterans Administration home loan, when granted by First Federal, Sydney and Zola gave a personal written guaranty to First Federal obligating themselves to pay all monthly payments due if the veteran-mortgagor defaulted. A total of forty Veterans Administration loans were approved in Bretz between approximately April 5, 1950 and November 16, 1950.

The payments on the Veterans Administration loans were fairly moderate in nearly all instances and amounted to

sums ranging from approximately $16.00 to $36.00. Nevertheless, of the forty loans granted, the original applicants made no payments whatsoever in the case of thirteen such loans as of January 13, 1951. For some period before and after this latter date, Sydney or Standard maintained payments in some fashion on the defaults, generally, to First Federal. These defaults were occasioned when occupiers abandoned the homes or failed to make payments. Then, Sydney, in his name, executed new Agreements of Sale for successor occupiers without disturbing the coverage of the Veterans Administration mortgage liens. On occasion this was done repeatedly for particular houses. Noticeable title to those houses was acquired by the recording of reconveyance deeds which title named either Sydney or Eugene Spirer, a brother-in-law of Sydney's, as the respective grantees. Eugene Spirer was used as a strawman.

There is no indication of what collections were made from these new occupiers, but we may fairly infer that some of the Veterans Administration mortgage payments were maintained out of the payments procured from the subsequent occupiers under these Agreements of Sale. Finally, conditions became worse, and Sydney, though personally obligated, or Standard, also, defaulted on the defaulted loan payments as due, and the Veterans Administration commenced foreclosure proceedings on defaulted loans.

The plaintiff maintains that the defendant in violation of the False Claims Act procured veterans as purchasers (1) by knowingly misrepresenting the net worth of the veterans-applicants; (2) knowingly procuring home owner applicants who had no intention of ever using the Veterans Administration loan properties as homes; (3) by knowingly sponsoring veterans whose incomes bore no reasonable relationship to the obligations; and (4) caused or brought about in concert with the other participants .foreclosures against such falsely and fraudulently presented Veterans Administration mortgages; and that this resulted in losses and damages to the Veterans Administration on these home loans which had been guaranteed in reliance upon false, fictitious and fraudulent statements or representations, as made and unknown to the Veterans Administration.

The defendant, Sydney, resists liability here because he asserts that (1) he did not personally and knowingly present or cause to be presented any false claim against the United States; (2) the plaintiff failed to establish an intent to defraud as an essential element of this cause of action; (3) the plaintiff suffered no actual damage; and (4) the plaintiff's claim is barred by the limitation of the applicable statute.

The evidence in this case is both manifold and complicated. A number of contentions have been here raised and argued by counsel for the parties. I have diligently and with effort extracted the facts from the many exhibits as supporting the oral evidence and have made extensive findings of facts. I have attempted to give definition to all of these in an overextended opinion. I have not specifically disposed of a number of the parties' arguments, but I am convinced that these either required no comments or rulings, or that they have been generally disposed of in the rulings as made.

## II. THE FALSE CLAIMS ACT

The False Claims Act was originally enacted on March 2, 1863, 12 Stat. 696 and later was adopted in § 3490, § 3494 and § 5438 of the Revised Statute (31 U.S.C.A. § 231, § 235). These sections provided for both criminal and civil remedies. Section 5438 made certain acts to defraud the Government crimes and punishable by imprisonment. Section 3490 made the violation of § 5438 subject to forfeitures and double damages. When § 5438 was repealed, its provisions though criminal in nature were incorporated by reference into the provisions of § 3490. United States v.

Rainwater, C.A.8, 1957, 244 F.2d 27, affirmed 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958).

Later, the question arose as to whether or not any action brought under the False Claims Act was civil and remedial or penal in nature. It was stated in United States v. McNinch, 356 U.S. 595, 598, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001:

"* * * But it must be kept in mind, as we explained in Rainwater, that in determining the meaning of the words 'claim against the Government' we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 542, 63 S.Ct. 379, 383, 87 L.Ed. 443; United States v. Wiltberger, 5 Wheat. 76, 95–96, 5 L.Ed. 37."

In United States v. Rainwater, supra, 356 U.S. at pages 592 and 593, 78 S.Ct. at pages 948 and 949, the Supreme Court noted:

"* * * In reaching our conclusion, we are aware that the civil portion of the Act incorporates, as a test of liability, the provisions of the criminal section as they were set out in § 5438 of the Revised Statutes of 1878, and that according to familiar principles the scope of these provisions should be confined to their literal terms. * * *"

It is because of this background of the criminal or penal nature of the action that it has been held that a cause of action under the False Claims Act is grounded in fraud, and therefore, the standard of proof necessary to be applied to establish liability under the Act must be by clear, unequivocal and convincing evidence. United States v. Ueber, C.A.6, 1962, 299 F.2d 310.

However, because the Act is to be confined to its literal terms, it does not follow that the civil provisions are to be ignored. In United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379 (1943) our Supreme Court characterized an action under § 3490–§ 3493 and § 5438 (31 U.S.C.A. § 231–§ 234) as "remedial" and one which imposes "civil sanction". The Court was called upon to make a ruling on the question of whether or not § 5438 imposed double jeopardy where there had previously been on the same cause of action a criminal prosecution and a plea of nolo contendere. This was followed by a fine. The Court then went on to say 317 U.S. at page 549, 63 S.Ct. at page 387:

"It is enough for present purposes if we conclude that the instant proceedings are remedial and impose a civil sanction. The statutes on which this suit rests make elaborate provision both for a criminal punishment and a civil remedy. Violators of § 5438 may 'be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars.' We cannot say that the remedy now before us requiring payment of a lump sum and double damages will do more than afford the government complete indemnity for the injuries done it. Helvering v. Mitchell, supra, 303 U.S. [391], 401, 58 S.Ct. [630], 634, 82 L.Ed. 917."

317 U.S. at page 550, 63 S.Ct. at page 387:

"Quite aside from its interest as preserver of the peace, the government when spending its money has the same interest in protecting itself from fraudulent practices as it has in protecting any citizen from frauds which may be practiced upon him. 'The powers of the United States as a sovereign, dealing with offenders against their laws, must not be confounded with their rights as a body politic. It would present a strange

anomaly, indeed, if, having the power to make contracts and hold property as other persons, natural or artificial, they were not entitled to the same remedies for their protection.' Cotton v. United States, 11 How. 229, 231, 13 L.Ed. 675."

"This remedy does not lose the quality of a civil action because more than the precise amount of so-called actual damage is recovered * *".

■ The objective of Congress, the Court stated, was to protect, broadly, funds and property of the Government against fraudulent claims, regardless of the particular form or function of the Government instrumentality through which such claims were made. We apply then the principles to enumciated now in this case where the plaintiff seeks to procure restitution to the Government for money which it claims was taken from it by fraud. United States v. Rainwater, supra; United States v. National Wholesalers, 126 F.Supp. 357, 358 (D.C., 1954), reversed on other grounds, C.A.9, 1956, 236 F.2d 944, cert. denied 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724 (1957). Fraud implies a misrepresentation of a material fact either expressed or implied. United States ex rel. Weinstein v. Bressler, C.A.2 (1947), 160 F.2d 403.

■■ While there have been holdings that a determination under the False Claims Act is to be made by a preponderance of the evidence United States v. Gardner, 73 F.Supp. 644 (D.C., 1947); United States v. Park Motors, 107 F. Supp. 168 (D.C., 1952), we are faced with the fact that the chief purpose of the Act was to provide restitution to the Government for money taken from it by fraud. United States v. Rainwater, supra; United States v. National Wholesalers, supra. However, we do have a double definition in the Act. One which relates to the criminal process and the other which relates to the civil process. In the criminal proceedings, the trier of the facts must be convinced beyond a reasonable doubt that a violation exists. In

a civil action, such as this, it is not required that it be proved beyond a reasonable doubt. Congress has provided in this Act against the making of false, fictitious or fraudulent claims, among other things. It will be noticed that this is in the disjunctive. But it has also provided that the making of such false, fictitious or fraudulent claims be done knowingly in order to be actionable.

■ When the Supreme Court in United States ex rel. Marcus v. Hess, supra, was called upon to characterize the $2,000 sum allowable for double damages, Mr. Justice Black, 317 U.S. at page 551, 63 S.Ct. at page 388 said:

"We think the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole. This conclusion is consistent with a statement made immediately before final passage of the bill. A Senator discussing these sections said: 'The government ought to have the privilege of coming upon him [a fraudulent contractor] or his estate and his heirs and recovering the money of which it is defrauded.' The inherent difficulty of choosing a proper specific sum which would give full restitution was a problem for Congress."

Under these circumstances the $2,000 amount is here indicated not as a penalty, but rather as a device with the double damages by which the Government is to be made completely whole for the loss or damage which it has suffered. It thus lends in an action under the False Claims Act the purpose and meaning of an action for damages. Since the action involves the element of fraud, the evidence upon which any judgment for the plaintiff must rest is, however, required to be clear and convincing. Eastern Express,

Inc. v. Mack Warehouse Corporation, C.A.3, 1964, 326 F.2d 554, 556.

██ The burden is upon the Government to prove by clear and convincing evidence that the defendant knowingly made false, fictitious or fraudulent representations of the material facts with knowledge of their falsity intentionally made and upon which representations the defendant procured or caused the Veterans Administration to act to its detriment.

## III. KNOWLEDGE

After considering this background, I now return to the facts in the case. Sydney Klein first defends that no liability can attach to him because the plaintiff has failed to establish that he, personally, knowingly and intentionally presented false claims.

I shall first discuss the entire Bretz transaction generally. The evidence clearly established that Sydney's partner and brother, Sam Klein in the field (Bretz) made contact with all applicants for Veterans Administration loans; that he paid an occasional small fee for information leading to prospective veterans-applicants; that he went to the former lessees-grantees under the Agreements of Sale and informed them that they could no longer stay unless they procured veterans to make applications for Veterans Administration loans for them; that he went into jails on two different occasions to sign up veterans; that he made no efforts to procure eligibly capable applicants for the loans; that he concerned himself not at all as to the credit standing or ability of the applicants to pay; that he did not concern himself with whether the veterans would use the houses as homes; that his only concern was that they be available as applicants for Veterans Administration loans; that he procured the signatures on blank forms for each of the applicants; and, that he procured the information separately and forwarded the signed blank applications to Sydney in Pittsburgh. I shall discuss later certain other papers procured at or near the same time.

I have no doubt from the evidence that Sam knew what he was doing and that his aim was to get Veterans Administration loans for the procurement of proceeds for the reduction of the $190,000 mortgage to First Federal. So it was done, whether or not the applicants were to live in the houses or were financially capable, or whether or not the occupiers of the houses, other than the veterans-mortgagors, had anchorage or responsibility for the repayment of the Veterans Administration loans. I am clearly convinced, by Sam's course of conduct at Bretz, that he knew the facts as they existed and that, in the questioned instances, he knowingly procured false information for the Veterans Administration loans.

However, Sam is not a defendant in this action, and it is incumbent upon the plaintiff to attach liability to the defendant Sydney, more so in the face of the sweeping denial of knowledge by Sydney. This denial is upon the broad ground (a) that he did not know what went on in the field (Bretz) because his brother Sam conducted the activities there, and (b) that he did not even know what the Veterans Administration Home Loan Guaranty Program was, nor anything of its laws or regulations by which it existed and operated. Let us see whether or not the evidence supports these contentions.

Sydney's part goes back to the beginning of Bretz. So far as is relevant here, the evidence shows that, shortly, after the beginning of the Bretz purchase he became vested with the exclusive title to all of the houses; that he was the obligor for the repayment of the $90,000 liability against Bretz; that he executed every Agreement of Sale for each individual house throughout the entire operation and from the time of acquiring of title to Bretz; that each of these was sent to him and executed by him at Pittsburgh; that he eventually, while vested with title to Bretz, expanded the mortgage obligation with Mortgage Service, as assigned

to First Federal in the sum of $190,000 (although in this he was ultimately joined by Zola and the respective wives); that with the proceeds of said mortgage and other borrowing, he and his brother Zola acquired the assets of Sunset Heights Realty Corporation for the purchase price of $213,973.54, subject to a mortgage on the Titusville real estate in the amount of $348,512.15; that he had information on the instability of many of the Bretz home occupiers as tenants-lessees under Agreements of Sale; that he was being pressured to reduce the $190,000 mortgage with First Federal because of the state bank examiners; that he entered into the agreement with First Federal for the procurement of funds from the Veterans Administration; that he was the head of the Standard partnership; that then he was the supervisor of the affairs of the partnership and was in charge of the legal work, accounting and paper work of the partnership; that he held weekly meetings with the other partners and Sam; that he received from Sam the blank applications for the Veterans Administration loans as containing only the signatures of the prospective veterans-purchasers; that he received all other information regarding each applicant separately and had this filled in on each application form; that he sent these filled-in applications to Mortgage Service with a $20.00 fee for the processing of each; that he with Zola personally guaranteed the payments for each Veterans Administration Home Loan in Bretz as granted by First Federal; that he, very quickly after the initiation of the Veterans Administration Program, was informed that defaults were occuring and procured payment of these through Standard; that in January 1951, he received a copy of Jefferson's letter on non-paying applicants and of the doubt of the bona fides of the program; and that when Sydney as obligor, or Standard, found it difficult to make payments of the defaults on the loans, he and Zola entered into another agreement with First Federal and Mortgage Service to force the Veterans Ad-

ministration into the foreclosing of the mortgages and agreed to accept the loss on each foreclosure suffered by First Federal after it received guaranty reimbursements from the Veterans Administration.

Here is Sydney's testimony as it appears at Transcript pages 766–768:

"Q. Mr. Klein, will you give me your conception of what the Veterans' Administration was and its purpose in this connection of home buying or home aid for veterans?

"A. You mean what my conception was at that time?

"Q. Yes, at that time.

"A. —Or together with what I have now learned?

"Q. No. What was it at that time?

"A. At that time I was under the impression that it was a benefit to any veteran who had served his country and had an honorable discharge, that it was more or less in the form of a gift. I say, a 'gift', because of the gratuity that went along with it, and also that they assured them very low interest rates, and so on. I understood that it was primarily for homes for them, but not limited to homes for them because we had on one other occasion sold homes that I mentioned in Titusville.

"Q. Not at all.

"A. Standard Real Estate Company at that time was very active in company towns. At the time we owned 18 whole villages. 8 in Pennsylvania, 8 in West Virginia, 1 in Kempton, Maryland and 1 in Alabama. In addition to that, we had considerable properties in other towns outside of Pittsburgh, and had properties in Pittsburgh. We also had interests in other businesses.

"Q. What were these other businesses?

"A. We had a partnership interest in the Peerless Department Store. We had a Lincoln Homes Agency which built 30 homes in Springdale that year. That is in the year 1949. And, we had a partnership interest in Metropolitan Distributing Company. We were owner of a small trucking firm. We had interest in Penn-Way Television Service Company, Sunset Heights Realty, Incorporated, and several other corporations. I personally served in all these capacities for the partnership. I was president of all these various corporations, Chairman of the Board of one, and I acted as partner in all these other interests for the Standard Real Estate Company."

It is difficult to believe that a businessman of such proportions as was Sydney could believe that the Government made a gift to veterans of the Veterans Administration home loans. Sydney processed the applications and could not have failed to note the financial information required by these. Neither could he have failed to note that credit reports were required together with other background information. Particularly, as a real estate man, he could not have overlooked the required binding documents obligating the veteran to repay the real estate loan. But Sydney says he was ignorant of these things, and yet Sydney had undertaken a separate obligation (afterwards with his brother Zola), to pay these loans if the veterans (or house occupants) did not. Why—if these were gifts? Did then Sydney guarantee these individual loans to First Federal because he knew that the Government was going to pay what they had guaranteed to each veteran on each loan? And if so, was this why eventually he entered into the agreement to pay First Federal the difference between First Federal's full loss and what reimbursement it could re-

ceive from the Veterans Administration? This was the second guaranty agreement concerning which I previously spoke. But if Sydney anticipated that the Government would pay these loans eventually, why did he take back reconveyance deeds from the veterans as of the time when he made the deeds to the veterans and before the Veterans Administration loans were granted? These were protective devices of a man who knew what he was doing—an experienced real estate man.

It is worthy of note that in the short time between the applications and the dates of certain of the reconveyance deeds, defaults obviously occurred before the actual Veterans Administration loans were granted, or approved or guaranteed, as the case may be, so that the reconveyance deeds had to be taken back at about the same time when the Veterans Administration applications were made. Either that, or else Sydney or someone in behalf of Sydney went to the veterans-grantees and obtained reconveyance deeds before the Veterans Administration approved or guaranteed the loans and then permitted the loans to be made by First Federal without informing the Veterans Administration so that the loans might be stopped. In either case, there was knowledge on the part of these negotiators of the contingent titles reverting back to Sydney, and of the factitious situation by which property was available to Sydney by the simple means of recording the deeds.

In considering the testimony of Sydney, his credibility and the weight which should be allowed his testimony, I do not agree with counsel for the defendant that he was a witness worthy of belief, or that his testimony is worthy of full weight. In observing the witness on the stand, I was not impressed with his earnestness. I am as well aware of a number of serious discrepancies.

At page 29 of his main brief, counsel for the defendant said:

"In sum, there is here, if anything, nothing more than a disregard of the

regulations of the Veterans Administration, careless, negligent and even inexcusable, if you will."

In the testimony, Sydney stated that he retained title to Bretz in behalf of Standard and that this was done as a matter of convenience. But in Exhibit G–44, which was the application for the procurement of the $190,000 mortgage loan, he stated in the answers there propounded that he was the "real owner" of Bretz; that he paid $250,000 for its purchase; and that he was self employed.

Perhaps Sydney was the title holder for Standard of the Bretz properties and was the guarantor and obligor under the various loans which were made, as a matter of convenience, but if so, there certainly was no necessity for him to falsify these facts when dealing with banks or lending institutions and borrowing money. This was a hazardous undertaking to make false statements when dealing with financial institutions—even as a matter of convenience.

These questions and answers are in evidence and are to be considered in relation to the credibility of the witness, Sydney, so that when the defendant's counsel states as he does, "In sum, there is here, if anything, nothing more than a disregard of the regulations of the Veterans Administration, careless, negligent and even inexcusable, if you will", I cannot accept this either as being true or as a defense. There were other discrepancies and failures to offer explanations, which do not help the defendant's credibility.

What happened after the Veterans Administration loans had been granted? Sydney continued to protest ignorance of the law and of the facts. In his testimony, he admitted that things were getting bad in the fall of 1950, even before the last loan had been approved by the Veterans Administration in November.

As of December 1950, the circumstances were as follows: Twenty-four of the forty Veterans Administration loans were in default; of the seven loans approved in April 1950, all seven had one or more defaulted payments; of the six loans approved in July 1950, on none had a payment been made; of the four loans approved in August 1950, on two no payments had been made at all and two were in default; and of the various loans approved in September, October and November 1950, six were in default, and of these five had had no payments at all.

By now we may surely believe that a reasonable person and particularly a a businessman of Sydney's proportion would have made it his business at least to go into the field or send investigators or representatives to ascertain why so many defaults were occurring—if he did not already know the reason.[4] And if, as Sydney asserts, he had no knowledge up until that time of the mortgagors and their surrounding circumstances, his suspicions and apprehensions must have by now become fully awakened.

And, even if he were slow witted and this I cannot credit to Sydney as a wise and sagacious businessman of many years and as the head of not only the Standard partnership but of the many other corporations of which he testified he must at last have become jarred by a copy of the letter dated January 12, 1951, which he received from Joseph M. Jefferson, Secretary of First Federal to Mortgage Service. Now at last he has been blasted with information that thirteen of the twenty-four accounts in Bretz had made no payments at all, and that in the additional eleven cases payments were then being made by Standard on behalf of the veterans-purchasers.[5] The

4. Sydney knew that the veterans were not making Veterans Administration home loan applications for the houses necessarily as homes as indicated at Transcript page 768, where he said, "Now there were many instances where we told them there was a tenant in there and would pay rent and they could occupy it later."

5. Even while Standard, of which Sydney was the head man, had recorded reconveyance deeds and renegotiated new Agreements of Sale which he had executed, was paying on these eleven defaulting mortgages, Sydney says he was without knowledge or suspicion.

letter further informed him that in most cases First Federal did not receive acknowledgments from the purchasers of correspondence, and in some cases mail was returned with information from the postal authorities that the addresses could not be located; that so many had made no payments whatsoever and the bona fide nature of these sales appeared to be somewhat in question; that there was very little, if any, judgment used or investigation made as to the credit standing of the purchaser; that notwithstanding the guarantee agreement of the Kleins, the Kleins should be brought to task even to the point of their taking assignment of these unsatisfactory accounts. If Sydney had had no question until now about the solidity of the Veterans Administration investments in these mortgages and his own perilous position to make payments on his guarantees, Mr. Jefferson's statement that "for this reason and the fact that so many have made no payments whatsoever, the bona fide nature of these sales would appear to be somewhat in question", must surely have awakened his perceptible, conscious knowledge. What did Sydney do here? He said that he did nothing more than to call in his brother Sam and ask him whether this was true. (Tr. pg. 760, 761) Very unconcernedly Sam replied, "No, it is not true", and still this businessman, saddled with these personal obligations and interested in preserving his assets, remained unconcerned and ignorant.

I saw Sydney on the stand as well as I saw Sam. I was not impressed by either, but I was less impressed with the credibility of Sydney than with Sam. I can give such evidence as this no weight. How far can one be asked to stretch his credibility that in the face of a shower of such overwhelming circumstances, Sydney and Sam were still ignorant of the true facts of the case?

In spite of Sydney's unwillingness to believe, the burden of his personal obligation to pay the defaulted loans was becoming more burdensome, and he entered into negotiations with First Federal for a new agreement. Now it was agreed that Sydney purchase the properties known as Chatham Hills; that the Veterans Administration be called upon to pay its guarantees on the Bretz loans, and that Sydney be relieved of his full obligations, except for the difference between the full debt and what First Federal would receive from the Veterans Administration.[6] This agreement was carried through.

Here now were the acts which "caused to be made", "used" and "presented" for, and in the "aiding to obtain the payment or approval" of false and fictitious claims. Here now Sydney was face to face with the facts which he had filled into the blank applications, *as they did not exist.* How much more than this did Sydney need? And yet he entered into the agreement, and participated in the placing of the Veterans Administration in the position where it was bound to pay what he knew or should already have known were false claims.

Here was the turning point. If Sydney's intent was not to defraud the Veterans Administration, he could and would honestly have faced the facts which existed in Bretz and not have participated in any manner to compel the Veterans Administration to pay out in his stead funds to its detriment on these badly founded Bretz loans. On the other hand, if his intent was to defraud, he would do what he did has he did—and know that the Government was about to suffer losses in his stead.

All this is clear and convincing, substantiated by the evidence with the fair inferences from the facts as they have been proven to exist in this case. Sydney knowingly caused and willfully permitted false entries and false information to be inserted in the applications for Veterans Administration loans. It was upon

6. Zola was also relieved of the whole obligation. Sydney as the only obligor after the Veterans Administration, was now to remain with a part of the obligation exclusively.

that information that the Veterans Administration innocently approved and guaranteed the loans. In the preparation of these loans no claim had yet been made against the Government and no right of action accrued, as yet to the Government. United States v. Toepleman, D.C., 141 F.Supp. 677, United States v. McNinch, supra. But based upon such false information as had already been proven to be false to him at the time when he participated in the causing of the foreclosures of these Veterans Administration loans as contained in the applications, he overtly aided, participated and combined with others and made or caused to be made, used and presented claims against the Government knowing that such claims were false, fictitious and fraudulent.

█ And still Sydney protests that he was ignorant and that he did not know of the conditions in Bretz, even as he dumped his burden onto the Veterans Administration. Just as I am unable to believe his protestations of ignorance when he called in Sam on the Jefferson letter, I am unable to believe his protestations of ignorance during the procurement of all of the veterans-applicants at the initiation of the campaign and during the campaign when the Veterans Administration was induced to guaranty false and fictitious applications.

I must, therefore, conclude Sydney knowingly caused false and fictitious statements and representations to be made when the Veterans Administration Program was introduced at Bretz, and subsequently carried through to fruition false and fraudulent claims when he agreed with First Federal to foreclosures on the Bretz mortgages for the reduction of his own liabilities to First Federal, as violations within the meaning of the False Claims Act.

The Act specifically refers to:

"Any person * * * who shall make or cause to be made, or present or cause to be presented, for payment or approval * * * any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claims to be false, fictitious, or fraudulent * * *."

The Act speaks of knowledge of the nature of the claim presented or caused to be presented. It does not speak of the knowledge of the existence of the Act or of its promulgated regulations. I cannot give the meaning to the Act for which the defendant contends, that he did not know what the contents of the Act or the regulations were, and that therefore he must be exonerated.

It speaks not of knowledge of the law, but rather of knowledge of the falsity, fictitiousness or fraudulent character of the claim by which the Government is put in the position or obligation to pay out monies. The False Claims Act does not require knowledge of the existence of the Act; it requires knowledge of the falsity, fictitiousness or fraudulent nature of the claim in order to charge one for its violation. Did Sydney know that the information and contents of the applications were false, fictitious or fraudulent and that the Government would be obligated to pay monies on the basis of these misrepresentations? Not, did Sydney know of the existence of the Act or of the promulgated rules or their contents?

The reason for getting the Veterans Administration loans in this case is apparent. The intent is made obvious in the way it was done, but not more so than by the ease with which the Agreements of Sale were brushed aside and the warnings given to the home occupants who held potential equities to get veterans backers or be ousted. The legal duty was upon Sydney to honor the Agreements of Sale which were supported by his signature. He neither denied these activities or asserted ignorance of their existence.

What wide awake businessman could possibly overlook in his possession his own signed documents which he would ordinarily regard as assets (in this case, accounts receivable) unless in the dis-

regarding of them, it served him another perhaps necessary or preferable purpose. I conclude that this action in sweeping aside the Agreements of Sale was deliberate, intended and knowledgeable; and as one of the isolated links in the whole chain of circumstances as known to Sydney.

Sydney was the head of his various corporations. He was the head of Standard. He was a real estate man with extensive real estate dealings. He was the one in charge of the accounting and legal work of Standard and its associated holdings. But he did not know that there was any legal requirement or regulation for Veterans Administration loans. As a real estate man, it must be presumed that he knew of the legal requisites in making mortgage loans for real estate generally, and he should have since he, himself, was involved with mortgages, deeds of trust and guarantees. It is unbelievable that he should have known nothing about the Veterans Administration home owners' loans except that they came from a grateful government and could help him out of his financial pressure in Bretz.

The plaintiff urges that the defendant was chargeable with knowledge of the rules promulgated pursuant to the authority in law as applicable to the Veterans Administration activity in this regard. The defendant contests this. Since I have already found that Sydney had knowledge not only of the facts as they existed from the very beginning and through the renegotiation whereby the Veterans Administration foreclosures were agreed upon but also of the legal requisites contained in the applications for the Veterans Administration loans, I need not make any ruling in this connection.

## IV. PARTNERSHIP

The plaintiff and defendant are in disagreement also on whether or not the principles of partnership have any application here. The plaintiff contends that liability and knowledge of one partner are liability and knowledge of all the partners, and that the Pennsylvania Uniform Partnership Act provisions apply to this case because the false claims were made in Pennsylvania. The defendant denies that either partnership principles or the Uniform Partnership Act has any application. In support of his contention, the defendant offers United States v. Priola, C.A.5, 1959, 272 F.2d 589, where the holding was that the False Claims Act is confined only to those persons who make or cause to be made a claim knowing such claim to be false, fictitious or fraudulent, and United States v. Toepleman (E.D.N.C., 1956), 141 F.Supp. 677, 682, where the holding was that the Uniform Partnership Act attached no liability to an individual partner.

In the Priola case, the judge relied upon Detrio v. United States, C.A.5, 1959, 264 F.2d 658. However, he misapplied the Detrio case which held that personal assets of a partner defendant were not reachable when there was no personal service upon that individual partner. The judge, ignoring the non-service feature in Priola, mis-applied the principle and projected it further by holding that where the individual partner had no personal knowledge of another partner's wrongdoing, he could not be liable under the False Claims Act. North Carolina had adopted the Uniform Partnership Act. In Toepleman, supra, the holding was that the Uniform Partnership Act attached no liability to the individual partner, but it unfortunately disregarded the North Carolina Uniform Partnership Act, Section 15 which imposed liability upon the partnership and upon the individual partners jointly and severally.

Pennsylvania also has adopted the Uniform Partnership Act.[7] If there were any necessity to resort in our case to the Pennsylvania Uniform Partnership Act, it would support the plaintiff. We are not here concerned with the liability of.

---

7. Act of 1915, March 26, P.L. 18, Part III, Sec. 13, 15; 59 P.S. § 35 and § 37.

the partnership or the remaining partners, but only with knowledge on the part of Sydney, the only defendant in this case; and the plaintiff has here met its burden by clear, unequivocal and convincing evidence that Sydney had knowledge of the false, fictitious and fraudulent representations both during the initiation of the Veterans Administration home loan campaign and when the Veterans Administration was called upon to make payments based upon those representations. Accordingly, neither of these cases have any application to our case.

■ At this point I shall also dispose of the plaintiff's contention put in argument orally and in a brief that liability can here be found attaching to Standard, the partnership, through the medium of Sam and Sydney. Before a court can exercise personal jurisdiction over a defendant, process of the court must be served upon the defendant within the requirements of federal law. First Flight Company v. National Carloading Corporation (S.D.Tenn., 1962), 209 F.Supp. 730. If the record shows any service here upon the partnership or upon the individual members, it must be by the service which was made upon Sydney only. An examination of the return as made by the Marshal shows service upon Sydney Klein personally at the Jones Law Building, his place of business, and it shows service upon Sydney Klein doing business as Standard Real Estate Company. While there are numerous authorities which hold that service upon a single partner is service upon all of the partners, and that service upon Sydney may be considered to be service upon Standard and the individual members of the partnership, we are met with something which prevents such an interpretation.

An examination also of the complaint and the amended complaint fails to show any intention on the part of the plaintiff to place liability either upon Standard, the partnership, or its individual members as such. If any liability is to attach to the partnership or to these individual members, it must be by a claim with sufficient notice against the partnership or the members be as set forth in the complaint. If no notice exists of any such claim in the complaint, the complaint will be dismissed. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

A claim cannot be inferred where there is none made nor any intention of making one—nor can an action exist without due process of law.

■ The plaintiff's argument, both orally and in its brief, is unusual and in any event rather late to attach liability when it has failed to take action in its pleadings and throughout the trial of the case to show any intention to hold the partnership and its individual members. Since the partnership nor its individual members are here on record as party defendants, there can be no judgment against the partnership or the individual members as such.

The case has in addition an abundance of substantial evidence aimed at Sydney as the head of the partnership firm, and it may well be that Sydney is liable as a partner of Standard because of his dual capacity, both as an individual dealer and as one assuming obligations and managing affairs in such a way as to show that he may have been a partner as well. Thus, it could be that liability would attach against him as a member of the partnership in addition to attaching against him personally.

However, there is no need for such a holding here because throughout this case the evidence is abundantly clear that Sydney was the main actor; the one who personally held himself out as self-employed; the negotiator of the Agreements of Sale; the maker of the mortgages even with Zola, and the actor in the many other instances in which he operated as an individual on a personal basis rather than as a partnership, wherein he procured or caused to be procured the presenting of false claims in order to relieve his personal liability on the Bretz properties. There can be no judgment imposed upon non-record party

defendants and no judgment may attach against either Standard or any of its individual partners not set forth in the pleadings.

## V. LIMITATION OF ACTION

■ The defendant contends that this action has been barred by the limitation contained in the Act and refers to the words in 31 U.S.C. § 235: "Every such suit shall be commenced within six years from the commission of the act, and not afterward". This provision is not a mere limitation of action. It is jurisdictional in scope. United States ex rel. Nitkey v. Dawes, C.A.7, 1945, 151 F. 2d 639; cert. denied 327 U.S. 788, 66 S.Ct. 808, 90 L.Ed. 1015 (1946). Accordingly, it must here appear that this action was brought within six years from the commission of the act or acts upon which this action is based.

The question was previously raised by motion to dismiss in this Court and was determined by our late brother, Judge McIlvaine. Judge McIlvaine relied upon McNinch, supra. McNinch involved a credit insurance application. The Supreme Court held there that the mere representation for credit insurance without anything more presented no cause of action under the False Claims Act, since it was not yet a claim against the Government.

■ It is only when a false claim is made that an actionable right accrues to the Government. United States v. Tieger, C.A.3, 1956, 234 F.2d 589. So then, the false or fictitious representations remain inert unless or until they are activated by the making of a claim. But even then, Section 235 of the Act becomes operative not when payment is first begun to be made on such false claims by the Government, but upon final payment. So that where a gratuity is paid at an earlier date to inaugurate a Veterans Administration loan guarantee, it is the date upon which such guarantee is claimed for payment and finally paid as falsely claimed, which becomes the operative date for limitation of action under Section 235 of the Act.

The statute is therefore tolled until the final payment date of each claim and here includes all losses as payments made by the Veterans Administration up to the time of the final payment. So, too, the time as included in the period in which the Government approved the applications and guaranteed the mortgage loans, would have no significance in themselves under the holding of McNinch. As stated in United States v. Tieger, supra, 234 F.2d page 591: "[T]he conception of a claim against the government normally connotes a demand for money or for some transfer of public property."

Judge McIlvaine in his opinion dated May 26, 1961, at page 7 said:

"Here the alleged false and fraudulent acts were the procuring of the loan applications. However, there were no false claims until the Government had to make payments. The Statute of Limitations begins to run on the date on which the plaintiff first has the right to bring action. Emich Motors [Corp.] v. General Motors Corp., 229 F.2d 714 [59 A.L.R.2d 159] (7th Cir., 1956). Therefore, until the Government had to pay under its guaranty program, the statute did not begin to run. 'The obtaining of the guaranty of loan was not the making of a claim within the meaning of the Statute.' U. S. v. McNinch, 242 F.2d 359, 364 (4th Cir.1957). See also U. S. v. Teigh [Tieger], 234 F.2d 589 (3rd Cir.1956). There was, however, a payment of gratuities more than six years prior to the institution of the suit. However, this while it might have given the United States a right to sue was not the basis of this suit. It is only an element of damages and did not start the Statute of Limitations to run as to bar this suit, and we specifically hold that the Statute of Limitations is not a bar to this suit."

The applications for home owners' loans were procured and in some instances instigated in the period com-

mencing April 1950, to November 1950. The Veterans Administration did pay out during these times what were known as gratuity payments, and if there had been nothing more the plaintiff would have been too late with this action, for the statute would have barred it.

Since it is the last date when the Government paid any money on a particular claim by which anchorage may be had for the jurisdiction required to maintain a false claims action, even though, as of such time, the Veterans Administration expended small sums of money as gratuity payments.

In other words, the early dealings and representations as made by the defendant were inchoate under the False Claims Act until payment was finally made upon them. They were submerged, so to speak, until a claim was made predicated upon them. When the claim was made, the dealings and representations emerged in full vigor and blended with and became a part of the claim as finally paid by the Government and a cause of action existed for six years from that last payment date.

Judge Hastie, in speaking for our Court of Appeals in United States v. Veneziale, C.A.3, 1959, 268 F.2d 504, at page 505 said:

"The False Claims Act provides statutory remedies for the wrongdoing of 'any person * * * who shall * * * cause to be presented, for payment or approval * * * any claim upon or against the * * * United States * * * knowing such claim to be * * * fraudulent * * *.' Here it is clear that the fraudulent statement in the loan application as to the purpose of the borrowing was an essential inducement to the Federal Housing Administration guaranty upon which the government has now had to pay. Thus the wrong of the defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money. Although the wrongdoer neither sought nor obtained any transfer of government funds or property to himself, it has long since been settled that a fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder by the government, whether to the wrongdoer or someone else. United States ex rel. Marcus v. Hess, 1943, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443."

At page 506 of 268 F.2d, Judge Hastie also said:

"The claim before us now is certainly 'grounded in fraud' in that a fraudulent misrepresentation induced the government to assume the obligation which it has had to perform. We are satisfied that the government, having been compelled to pay an innocent third person as the result of the defendant's fraud in inducing the undertaking, is entitled to assert a claim against the defendant under the False Claims Act."

Restating what Judge Hastie said, 268 F.2d at page 506, then, the claims before this Court are certainly grounded on false, fictitious or fraudulent applications for veterans home owners' loans, and such false, fictitious or fraudulent misrepresentations induced the Government to assume the obligations which it had to perform; and having been compelled to pay as a result of such induced obligations by false, fictitious or fraudulent misrepresentations, the Government is entitled to assert a claim against the defendant under the False Claims Act, and it is timely brought.

## VI. MITIGATION OF DAMAGES

The defendant also argues that he is entitled to credit or mitigation of damages because the Government collected $60,000 on account of its claim against First Federal.

The defendant sought to introduce or procure evidence that $60,000, more or less, was paid by First Federal to the Government in settlement of its claim

for damages because of these transactions. At the trial of this case, I reserved decision as to the admissibility of this evidence. The evidence was incompetent to show that First Federal paid anything to the Government. It indicates that some person paid a lump sum in behalf of First Federal. What the ramifications are in back of this evidence are purely speculative.

 We know that a number of others were involved in the Bretz deals as participants. We don't know what the involvements were. We don't know what claims, if any, there were and against whom. No evidence was introduced that First Federal paid any money, nor is there any evidence of why the $60,000 was paid. To make a deduction here that it was basically and totally on account of the Klein claim is pure speculation. Accordingly, the evidence to which the plaintiff objected, lacks any probative weight to support the defendant's contention. In any event, in United States ex rel. Marcus v. Hess, 60 F.Supp. 333 (W.D.Pa., 1945), affirmed in C.A.3, 154 F.2d 291, under the federal rule relating to the release of joint tort feasors, the release of a contributing defendant does not release a noncontributing defendant. We must then apply the law as we know it to contribution and rights of mitigation in wrongdoers who are compelled to pay for their wrongful acts. For these reasons the defendant has no mitigation rights in the plaintiff's claim against him.

As previously stated, the general intention of Sydney was to procure available veterans for the accomplishment of his program in procuring Veterans Administration loans on the Bretz houses. The intention was not to procure eligible applicants, but rather available applicants who would serve his purpose in procuring proceeds for the reduction of an inflated mortgage on the Bretz houses.

But, while this was the general intention of the defendant, the burden was upon the plaintiff to prove by the proper measure of evidence that the defendant knowingly furnished false and fictitious information and representations in the application forms as to specific individual applicants, and that he further fraudulently used such false and fictitious information and representations in the application forms in the making or causing to be made claims upon the plaintiff knowing the same to contain such false and fictitious statements or entries.

The plaintiff has not met its burden in the cases of William Anglin, Jr., William Ayersman, Raymond Hoskins and James Jenkins. In the cases of Joe David Harris, Leslie C. Howell, James C. Cordwell, Raymond W. King, Ercil Bosley, Edward Blosser, Carl Beveridge and Delmar Lowther, the plaintiff has produced clear unequivocal and convincing evidence that the defendant made false claims against it and to its detriment and to the defendant's advantage.

Accordingly, the plaintiff is entitled to judgment for the amount of damages so found and to the sum of $2,000 forfeiture in each of the said claims.

The defendant, however, contests the right of the plaintiff to receive damages with the allowance of credits due from the doubled damages. The question here is to whether credits are allowable from single damages or double damages. Certain credit amounts were received by the plaintiff after foreclosures of the properties. The Government urges that damages should be first doubled and that allowable credits should be deducted from the double damages. The defendant disagrees. The Act provides that in addition to the $2,000 forfeiture, the plaintiff is to be allowed double the amount of damages which it may have sustained. The Act does not indicate when damages are to be doubled, it merely provides for double the amount of damages, and this reasonably appears to be such as are finally determined.

 Accordingly, the credit should be first deducted from the single damages as finally determined and the remainder doubled for the purpose of determining the amount of damages to which the plaintiff was entitled. Judgment will be entered accordingly.