UNITED STATES of America ex rel.
Henry Z. VANCE

v.

WESTINGHOUSE ELECTRIC CORP.

Civ. A. No. 72–509.

United States District Court,
W. D. Pennsylvania.

Sept. 15, 1973.

Paul Titus, Pittsburgh, Pa., for plaintiff.

Donald C. Winson, Pittsburgh, Pa., for defendant.

## OPINION

KNOX, District Judge.

■ The court has before it a motion to dismiss a qui tam [1] action brought by the relator Henry Z. Vance on behalf of himself as an informer and the United States versus Westinghouse Electric Corporation under the provisions of the False Claims Act, 31 U.S.C. §§ 231 and 232. Relator had been employed by the defendant for twenty nine years until August 1971 when he states that he was forced to take early retirement after he had protested the methods followed in presenting claims on the project in question. He was supervisory buyer in the later years in the Astro Nuclear Division of defendant by which the allegedly false claims were filed.

Complaint was filed June 23, 1972, and pursuant to 31 U.S.C. § 232(C),[2] copies were served upon the Attorney General and the United States Attorney for this District. On August 24, 1972, the United States filed a statement informing the court that it declined to enter the suit.

On October 18, 1972, the defendant filed a motion to dismiss on the grounds that the "suit was based upon evidence or information in possession of the United States or any agency, officer or employee thereof at the time such suit was brought" and claiming that therefore under 31 U.S.C. § 232(C) the court had no jurisdiction to proceed with the suit.

On filing of this motion and after a preliminary pretrial conference, the court ordered discovery to proceed limited, however, to matters pertaining to the motion, i. e., whether or not the evidence or information upon which the suit was based was in possession of the government at the time the suit was brought. Discovery thereupon proceeded limited to these matters and various affidavits were filed following which briefs were filed and argument held. The motion also raises the question of applicability of the statute of limitations (31 U.S.C. § 235) to certain counts in the complaint.

It seems to be the contention of the defendant that the motion to dismiss is a motion raising the defense of lack of jurisdiction over the subject matter under Rule 12(b)(1). The difficulty with this is that such a motion must be presented under 12(b) prior to pleading. In this case the defendant answered on the merits before filing this motion. It is the contention of the plaintiff that

---

1. "Qui tam" is the phrase used to describe an informer's action brought by one who sues for the State or the United States as well as for himself. See Black's Law Dictionary; 1 C.J.S. Actions § 1, p. 948.

2. "Whenever any such suit shall be brought by any person under clause (B) of this section notice of the pendency of such suit shall be given to the United States by serving upon the United States Attorney for the district in which such suit shall have been brought a copy of the bill of complaint and by sending, by registered mail, or by certified mail, to the Attorney General of the United States at Washington, District of Columbia, a copy of such bill together with a disclosure in writing of substantially all evidence and information in his possession material to the effective prosecution of such suit. The United States shall have sixty days, after service as above provided, within which to enter appearance in such suit. If the United States shall fail, or decline in writing to the court, during said period of sixty days to enter any such suit, such person may carry on such suit. If the United States within said period shall enter appearance in such suit the same shall be carried on solely by the United States. In carrying on such suit the United States shall not be bound by any action taken by the person who brought it, and may proceed in all respects as if it were instituting the suit: Provided, That if the United States shall fail to carry on such suit with due diligence within a period of six months from the date of its appearance therein, or within such additional time as the court after notice may allow, such suit may be carried on by the person bringing the same in accordance with clause (B) of this section. *The court shall have no jurisdiction to proceed with any such suit brought under clause (B) of this section or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought . . . ."*

the motion is one for summary judgment under Rule 56 and that the issue before the court is whether there is any genuine issue of material fact. As noted, various materials and depositions have been presented to the court for consideration in connection with the disposition of the motion as in the usual motion for summary judgment under Rule 56. This, however, is not conclusive since the court often receives affidavits, depositions, etc., in connection with motions to dismiss for lack of jurisdiction over the person or over the subject matter.

■■ It is the opinion of the court, however, that this procedural problem is of no importance. The act in question clearly states in 31 U.S.C. § 232(C). *"The court shall have no jurisdiction to proceed* with any such suit brought under clause (B) of this section or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States or any agency, officer or employee thereof at the time such suit was brought". We thus have a question of jurisdiction over the subject matter which can be raised at any time and may even be raised by the court on its own motion. In the light of the disposition which we make of this motion, it makes no difference whether this is treated as a motion under Rule 12 or motion for summary judgment under Rule 56.

In approaching the problem presented by this motion, the court has considered the literal wording of the act, the decision of the various courts interpreting

this language relative to evidence or information in possession of the government at the time the suit was brought, and the debates and materials contained in 89 Congressional Record, pages 10744–10752 and 10844 and 10846 relative to the passage of the bill containing the language in question on December 23, 1943. There can be little doubt that the 1943 Amendment was occasioned by the decision of the United States Supreme Court in United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (Jan. 18, 1943) in which case (originating in this district) the court allowed an informer to recover on a complaint which was based upon facts obtained from an indictment procured by the government against contractors filing false claims. The evils of permitting informers to merely copy indictments or complaints filed by the government which has already worked up the evidence and recovering a fifty percent commission were decried by the then Attorney General Biddle and the dissent of Mr. Justice Jackson at 317 U.S. at 556, 63 S.Ct. at 391 et seq.[3]

We have carefully examined 89 Congressional Record 10744–10752 and 10844–10846 and have endeavored to find some trace of an explanation of the language in question. It appears that there was originally a House bill which was designed practically to abolish informer suits. The Senate, however, did not agree with this, feeling that the False Claims Act permitting informer's suits which originally had been enacted at the time of the Civil War at the urgent request of President Lincoln, who was disturbed at contractors robbing the

3. "But there is nothing in the text or history of this statute which indicates to me that Congress intended to enrich a mere busybody who copies a Government's indictment as his own complaint and who brings to light no frauds not already disclosed and no injury to the Treasury not already in process of vindication.

"In this case the Government investigated respondents and on November 3, 1939, indicted them for conspiracy to defraud. On January 5 and February 6, 1940, the defend-

ants named in the indictment entered pleas of nolo contendere, and fines were imposed. While the criminal case was still pending, and on January 25, 1940, petitioner commenced his informer proceeding, the averments in his complaint being substantially a copy of the indictment. *It is not shown that he had any original information, that he had added anything* by investigations of his own, or that his recovery is based on any fact not disclosed by the Government itself."

country during its time of travail, served a useful purpose. However, as disclosed in the Marcus case and other incidents which were brought to light, it had become a fertile field for activities of racketeers who would copy indictments or material developed by a Senate Investigating Committee, bring an informer's suit and reap a bounteous harvest, the percentage at that time being fifty percent. The Senate took the position that the informer's suit served a useful purpose as long as racketeering was prevented and in the Senate Amendments for the first time appeared the language that the court should have no jurisdiction to proceed with any suit when it was made to appear that it was based upon evidence or information in the possession of the United States, etc., at the time the suit was brought. See 89 Congressional Record 10745. The matter went to conference and the conference report and statement with respect thereto is set forth in the proceedings of December 17, 1943 (House) 89 Congressional Record 10844, et seq. The only thing which really casts any light upon the purpose of the language is contained in the statement of Congressman Walter one of the House managers at page 10846.[4]

This legislative history as the result of the confusion existing at the time of the adoption of the conference report by both Houses is, as has been pointed out by several courts, inconclusive with respect to the exact meaning of the language in question. Circuit Judge Hastie considered this matter of legislative history in United States v. Aster, 176 F. Supp. 208 (E.D.Pa.1959), aff'd United States v. Aster, 275 F.2d 281 (3d Cir. 1960). He recognized that the case of United States ex rel. Marcus v. Hess, supra, and other evils exposed at the same time constituted the stimuli resulting in the legislation and that the debates, particularly the remarks made by Senator Langer, indicated that the Congress only wanted to abolish "parasitical" actions which were based upon public information already in the possession of the government. In Aster, Judge Hastie pointed out: "The essential information upon which the suit is predicated" was already in possession of the government at the time of filing suit. Aster presented the peculiar situation where the informer had given the government all the information upon which suit was based four to five months before instituting suit himself and the court held that this barred the action applying the literal interpretation to the language in question. The legislative history of this act has been further examined in United States ex rel. McCanns v. Armour and Company, 146 F.Supp. 546 (D.C.1956), aff'd 102 U.S.App.D.C. 391, 254 F.2d 90 (1958) (where the informer had been employed by the government and used evidence obtained during employment) and United States v. Pittman, 151 F.2d 851 (5th Cir. 1945).

■ Regardless of the background and the reason for this legislation, we are bound by the determination with respect to this language made by our Court of Appeals in United States v. Aster, supra, to wit: that the absolute language of the act controls regardless of Congressional intent, and suits by informers are barred where the essential information upon which they are based is already in the hands of the government regardless of the government's source of information.

This, however, does not settle the question before us in this case. Applying ourselves to the literal language of

---

4. "We feel that by enacting this compromise legislation the United States will be amply protected and at the same time there will not be this ever-present invitation to racketeers to examine indictments, to examine reports of the Truman committee, or if you please, for dishonest and unscrupulous investigators to turn over information to their friends or co-conspirators for the purpose of bringing suit against our citizens on information that either comes to them *by reading an indictment or a bill of complaint or through testimony before some committee or which comes to them in their official capacity* as a representative of the United States." (Emphasis added.)

the act, what do these words mean when applied to a case such as this? This suit is not founded upon any information contained in an indictment or complaint filed by the government nor does it involve information obtained by a government employee in the course of his employment. We rather have here information gained by an employee of the defendant industry in the course of his employment with that industry. The charges made in this complaint are based largely upon what the employee himself observed while working for defendant and are not based upon bills, invoices, etc. in the hands of the government or audits made by the government.

■■ While ordinarily the burden is upon the person who asserts federal jurisdiction to bring himself within the language of the act conferring such jurisdiction upon the court, the clause in question here is rather an exception to a general grant of jurisdiction. It will be noted that the words are: "whenever it shall be made to appear". It has been held in a very well-reasoned decision by Chief Judge Parker in United States v. Rippetoe, 178 F.2d 735 (4th Cir. 1949) that it is not the plaintiff's burden to negative knowledge of government officials of the evidence and information. In other words, it is not incumbent upon the plaintiff to prove a negative. The court in Rippetoe said:

"In this holding we think there was error. In the first place, we do not think it incumbent upon plaintiff to negative knowledge on the part of government officials of the evidence upon which his action is based. The provision of the statute is that when 'it is made to appear' that the suit is based upon evidence or information in possession of the United States, etc., the court shall be without jurisdiction to proceed with it. This clearly means, not that plaintiff must in his pleadings or otherwise negative knowledge on the part of government agents, but that the court shall lose jurisdiction whenever that fact is established in the case."

It was specifically held that knowledge on the part of government officials involved in the fraud was not the knowledge referred to in the act. The court in concluding Rippetoe said:

"Upon further hearing the court should find specifically what the facts are constituting plaintiffs' alleged cause of action and specifically what knowledge of these facts there was on the part of officers of the government whose knowledge would defeat the court's jurisdiction to entertain the suit. If upon the hearing it is established that there was such knowledge, the case will, of course, be dismissed in accordance with the mandate of the statute."

■ Heeding this directive, we shall therefore direct our inquiry to determine whether the government had in its possession all the essential information upon which this suit was based at the time suit was brought. We do not consider the fact that the government may have had in its possession certain documents, bills, invoices, contracts, etc., as conclusive of the matter at all, if the underlying information with respect to the same is developed by the plaintiff. In other words, as we view this section of the act, the fact that the government may have had the bills and invoices in its possession covering the amounts of the claims involved, does not necessarily show that the government had the underlying facts in its possession to show that claims were padded or fabricated as the case may be.

In viewing the record developed thus far in this case with this in mind, we conclude that there has been no showing that the underlying data indicating that some of these bills may have been padded or improperly imposed upon the project in question was known to the government. The government, of course, knew the amount of the bills and had made certain auditing investigations, but this does not demonstrate that the government developed all the facts which the plaintiff now contends shows the claims were false.

At the present time, of course, in dealing with this motion to dismiss, we are making no determination as to whether any false claims actually were presented to the government or not. It may be that in the final analysis the evidence will show that the claims were not false and were entirely justified and proper under the circumstances of the case. We are only considering plaintiff's allegations now to determine whether all the underlying evidence to support this suit was in possession of the government at the time the suit was brought.

It is alleged that the Astro-Nuclear Division of Westinghouse Electric submitted false claims to the government for payment as a subcontractor under the NERVA Program (Nuclear Engine for Rocket Application) during the period 1961–1972.

Westinghouse Electric the defendant was a subcontractor to the Aero Jet General Corporation under the National Aeronautics and Space Administration (NASA). The contract was a cost plus a fixed fee and, as in any such contract, arguments can easily arise over what costs are to be included in the billing to the government. Plaintiff's claims may be summarized as follows:

(1) The defendant is accused of entering into a contract with an entity known as Nuclear Defense Research Corporation of Albuquerque, New Mexico, for the purpose of obtaining consulting services for a project unrelated to the NERVA program and it is alleged that the costs of this contract were knowingly and improperly included in the overhead costs allocable to the NERVA Project.

(2) It is contended that defendant improperly absorbed overhead costs from other divisions into the NERVA Project and passed these on to the government.

(3) The defendant purchased a certain transformer called "a six megawatt transformer and rectifier" at a cost around $200,000 which it is claimed was not needed for the NERVA Project, was not used, and this was purchased after other transformers had been purchased and not used. It is further claimed that this transformer and rectifier were purchased from defendant's own works at Sharon, Pennsylvania.

(4) It is claimed that the defendant purchased other items and tools which were not needed for the project and knowingly increased the cost thereof without any necessity for the mere purpose of avoiding a reduction in funds allocated to defendant under the program.

(5) It is claimed that defendant sold items purchased by government money at sale prices far below their true value and without receiving competitive bids.

It does appear from the testimony of Mr. Deasy, the government auditor in Pittsburgh, that the government had the invoices covering these matters before it and made some investigation of the basis for them. It does not appear, however, that this audit was complete or developed all the information which plaintiff allegedly had in his possession showing the padding of bills and excessive purchasing of items to be loaded on this project. Certainly, the government would have no knowledge of the motivation of the defendant and the details as to how and why these costs were loaded onto the project. Defendant in his position would know these facts.

We would assume that the government would audit costs in connection with the costs plus fixed fee audit. If, however, the audit was not thoroughly performed and failed to develop facts which were successfully covered up by the defendant, it cannot be said that a suit brought under this act as is this suit, is based upon evidence in possession of the government. Rather, it appears that this suit is based upon evidence outside the possession of the government including the knowledge of the plaintiff.

For these reasons, we cannot say with any confidence at this time that it "has been made to appear that such suit is based upon evidence or information in possession of the United States or any

agency, officer or employee thereof at the time such suit was brought". We agree with plaintiff that for the defendant merely to prove that the government had knowledge of bills which it paid and had made some sort of audit of the same without necessarily thoroughly developing all the facts relative to padding and excessive expenditures and then claim the suit was barred would completely defeat the purpose of the act.

■ It may be that at a later date it will appear more clearly that the government did explore everything there was to be found out about these bills and claims presented to it in connection with this project and that the suit is based on the facts so developed. If so, we will have to determine at that time that we have no jurisdiction to proceed further with this action. All we are holding is that at this time it has not been made sufficiently clear to us that the government had possession of all the information upon which these charges were based at the time the suit was brought.

One other matter must be considered. The defendant also claims in its motion to dismiss that certain of the claims are barred by the six-year statute of limitations contained in 31 U.S.C. § 235.[5]

■ It is true that this is no ordinary statute of limitations but is a prerequisite to bringing a statutory cause of action and as such it is subject to a motion to dismiss. See United States v. Klein, 230 F.Supp. 426 (W.D.Pa.1964).

■ The difficulty with defendant's position is that United States v. Klein, supra, decided by Judge Rosenberg of this court and affirmed by the Third Circuit in 356 F.2d 983 (3d Cir. 1966), clearly holds that in suits under the False Claims Act, the six year period does not start to run until the final payment date of each claim. The reasoning is that there are no false claims until the government makes payment and not until then did the statutory six

year period start to run. In the instant case, some of these claims were paid as late as the year 1968 and hence the suit was well in time.

### ORDER

And now, to wit, September 15, 1973, upon consideration of the materials presented and the briefs and arguments of counsel, for reasons set forth in the foregoing opinion,

It is ordered that defendant's motion to dismiss be and the same hereby is denied without prejudice to defendant's right to raise the same question if it should later appear to the court that this suit was based upon evidence or information the essentials of which were in possession of the government at the time suit was brought.