**Joseph H. JANKOWITZ**

v.

**The UNITED STATES.**

No. 83–75.

United States Court of Claims.

April 14, 1976.

---

Herbert A. Levy, attorney of record, for plaintiff; Allen Lashley, New York City, of counsel.

Leslie H. Wiesenfelder, Washington, D.C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D.C., for defendant; Alexander Younger, Washington, D.C., of counsel.

Before SKELTON, NICHOLS and BENNETT, Judges.

## ON PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS AND ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

In this civilian pay case plaintiff sues under the Back Pay Act of 1966, 80 Stat. 94, 95, 5 U.S.C. § 5596 (1970), and 28 U.S.C. § 1491 (1970), seeking pay and allowances which he would have earned had he not been made the object of an adverse personnel action.[1] Defendant has lodged in its responsive pleading an affirmative defense of setoff of damages for "deceit," as the alternative to its first counterclaim, under the False Claims Act, 31 U.S.C. § 231 *et seq.* (1970), as well as a second counterclaim for return of alleged bribes, gratuities, kickbacks, and similar illegal payments to plaintiff. Defendant invokes our jurisdiction of its counterclaims pursuant to 28 U.S.C. § 1503 (1970).

At all relevant times prior to March 28, 1972, plaintiff was employed as an appraiser, GS–11, step 7, $15,973 per annum, in the Federal Housing Administration (FHA), Department of Housing and Urban Development (HUD), at a location in the State of New York. On that date he was indicted by a grand jury in the United States District Court for the Eastern District of New York. The indictment charged plaintiff with having received two separate illegal payments of $100 each in return for being influenced in his official acts as an appraiser in connection with the premises known as 260 51st Street, Brooklyn, New York.

On March 31, 1972, plaintiff's employer transmitted to him an advance notice of proposed indefinite suspension without pay during the pendency of the criminal action. The reason cited for this action was: "You were indicted by the Federal Grand Jury for the United States District Court, Eastern District of New York, on or about March 28, 1972 * * * for accepting bribes." Plaintiff made a written reply on April 3, 1972, but it was ineffective and indefinite suspension without pay was imposed on April 6, 1972. After a hearing was conducted on June 1, 1972, the New York Regional Office of the Civil Service Commission, by order dated July 5, 1972, approved both the substantive and procedural aspects of plaintiff's suspension. That office recognized in its decision that the suspension was based upon the fact of plaintiff's indictment, and not upon any separate administrative charge to the effect that plaintiff was actually guilty of the bribery as alleged by the grand jury. The Civil Service Commission's Board of Appeals and Review affirmed on November 13, 1972.

Just over 1 month prior to final Civil Service Commission action on his administrative appeal, on October 1, 1972, plaintiff went on trial in the Eastern District of New York. The trial involved 23 defendants charged on 211 separate counts, and lasted

1. 5 U.S.C. § 5596(b) (1970) provides, in pertinent part:

"(b) An employee of an agency who, on the basis of an administrative determination or a timely appeal, is found by appropriate authority * * * to have undergone an unjustified or unwarranted personnel action that has resulted in the withdrawal or reduction of all or a part of the pay, allowances, or differentials of the employee—

."(1) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect an amount equal to all or any part of the pay, allowances, or differentials, as applicable, that the employee normally would have earned * * * if the personnel action had not occurred, less any amounts earned by him through other employment during that period; * * *."

from October 1, 1973, to June 18, 1974, ending in plaintiff's acquittal of all charges by a jury verdict and judgment entered June 18, 1974. Plaintiff conceded at argument that during the entirety of the trial he was unavailable for the performance of his job.

On June 19, 1974, plaintiff reported to his employer for duty and requested reinstatement. By notification of personnel action dated December 13, 1974, plaintiff was officially returned to duty, effective retroactively to June 19, 1974, at a salary commensurate to GS-11, step 7. Plaintiff has never been paid for the period between June 19, 1974, when he presented himself for duty, and the date he actually returned to work, November 5, 1974. Defendant concedes plaintiff's entitlement to judgment for this period only. For the period of indefinite suspension without pay between April 6, 1972, and June 19, 1974, plaintiff was not paid and claims it here. Effective February 20, 1975, plaintiff retired from the service for disability and he brought this suit on March 24, 1975.

Relative to defendant's affirmative defense and counterclaims certain additional facts must be taken into account. The alleged illegal payments to plaintiff are said to have been made on or about October 31, 1968, and January 30, 1969. Defendant avers that in return for such illegal payments plaintiff intentionally inflated his appraisal of the land and improvements at 260 51st Street, Brooklyn, New York, from $16,150 to $23,850. Plaintiff admits only increasing the appraisal. Defendant says further that FHA insured against default upon indebtedness secured by this property in an excessive amount reflecting plaintiff's inflated appraisal. Such default did occur, so far as the application for insurance benefits indicates, not earlier than January 1970. Thereafter, insurance benefits out of proportion to the reasonable value of the collateral were paid and the Secretary of HUD acquired title to the property as well as an assignment of the paper embodying the defaulting party's obligations to the mortgagee/assignor. The application for such in-

surance benefits, dated February 15, 1973, was presented to FHA on February 22. Defendant's counterclaims were filed on May 23, 1975. Therefore, between the date of the alleged illegal payments and the filing of these counterclaims there expired a period in excess of 6 years. Between the date of the obligor's default and the filing of the counterclaim, 5 years and nearly 5 months elapsed. Between the filing of the claim for FHA insurance benefits and the filing of the instant counterclaims, only 2 years and 3 months went by. Finally, defendant has provided an affidavit tending to prove that not until March 1970 were facts reasonably known to FBI investigators leading to discovery of plaintiff's alleged bribery.

Plaintiff now moves for summary judgment on his back pay claim and to dismiss the affirmative defense and counterclaims, on the ground that they are barred by applicable statutes of limitations. All other of plaintiff's arguments touching defendant's counterclaims have been abandoned. Defendant cross-moves for summary judgment as to plaintiff's back pay claim, and opposes plaintiff's bid for dismissal of both counterclaims. For the reasons stated below, we think that plaintiff's motion should be allowed insofar as it seeks summary judgment for back pay, but only for the period between June 19, 1974, and his actual return to work, as defendant has conceded. We have concluded, further, that the defendant's affirmative defense and counterclaims are not barred by applicable statutes of limitations. Accordingly, to this extent plaintiff's motion should be denied.

I

Plaintiff as moving party encounters the burden of demonstrating his entitlement to summary judgment for back pay as a matter of law. Rule 101(d); *e.g., Housing Corp. of America v. United States,* 468 F.2d 922, 924, 199 Ct.Cl. 705, 710 (1972). As we have seen, the Back Pay Act of 1966 authorizes us to make such an award only where it appears that the plaintiff has undergone "an unjustified or unwarranted personnel

action."[2] In accordance with statutory authority conferred by 5 U.S.C. § 5596(c) (1970), the Civil Service Commission heretofore has adopted regulations interpreting this statutory language:

> (d) To be unjustified or unwarranted, a personnel action must be determined to be improper or erroneous on the basis of either substantive or procedural defects after consideration of the equitable, legal, and procedural elements involved in the personnel action. [5 C.F.R. § 550.803(d) (1975).]

Within this framework the moving party here must particularize for us the way in which his indefinite suspension from duty without pay was unjustified or unwarranted.

■ Plaintiff relies principally upon the position that his suspension from duty without pay was unjustified and unwarranted because procedurally defective. He calls our attention to the undisputed fact, previously mentioned, that his advance notice of proposed indefinite suspension cited his *indictment* as its basis; not the acts underlying the indictment—alleged bribery. Since the personnel action was bottomed upon the indictment itself, and not upon the alleged criminal acts, plaintiff presses upon us the view that his acquittal in effect retroactively destroyed the legal efficacy of his indictment as a basis for adverse personnel action. At first blush this notion seems extravagant indeed; we have held on many occasions that in the normal case acquittal of a criminal charge does not lead inexorably to the conclusion that an adverse personnel action was unjustified or unwarranted, where based upon the same alleged conduct. *E.g., Holman v. United States,* 383 F.2d 411, 181 Ct.Cl. 1 (1967); *Prater v. United States,* 172 Ct.Cl. 608 (1965); *Finn v. United States,* 152 Ct.Cl. 1 (1961); *Bryant v. United States,* 122 Ct.Cl. 460 (1952), *cert. denied,* 344 U.S. 913, 73 S.Ct. 335, 97 L.Ed. 704 (1953); *Croghan v. United States,* 89 F.Supp. 1002, 116 Ct.Cl. 577, *cert. denied,* 340 U.S. 854, 71 S.Ct. 71, 95 L.Ed. 626 (1950). We have approved the principle

just stated because of the different standards of proof prevailing in criminal prosecutions and adverse personnel actions.

Plaintiff believes the instant case to be different, however, in that the indictment itself was offered as the reason for proposed indefinite suspension. He has referred us to certain provisions in the Federal Personnel Manual (FPM) to support his contention that acquittal vitiated the cause for action against him.

S3–2 INSUFFICIENT CAUSE

> a. *Pitfalls to avoid.* Agencies should be alert to avoid such errors as the following:
>
> \* \* \* \* \* \*
>
> (2) *Cause based on criminal indictment.* Except when the agency suspends an employee indefinitely pending disposition of a criminal action, the agency should not base an adverse action on a criminal indictment or conviction. Instead, the agency should base the action on what the employee did that was wrong. If the cause relied on is a criminal indictment \* \* \*, then a subsequent acquittal of the employee \* \* \* would, in effect, vacate the cause for action. However, if the cause relied on is the employee's acts of wrongdoing, generally the administrative action will not be affected by the subsequent court action on the criminal case. [FPM Supp. 752–1, S3–2a(2) (1972).]

Much the same language is repeated in FPM Supp. 752–1, S7–1c(2) (1972), located in subchapter S7, Notice of Decision. We think plaintiff's mistake resides in taking the wording of these provisions at face value, neglecting to consider whether they really apply to the facts of his case. Defendant in contending that we should not deem ourselves bound by the FPM, since that publication does not arise to the dignity of regulations having the force and effect of law, also appears not to have faced the question of whether the quoted language applies here. There is no need to decide

---

2. *See* note 1, *supra.*

whether such FPM provisions are regulations binding upon the agency in the sense understood by the Supreme Court in *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).[3] In our judgment the employing agency complied with all guidelines of the FPM which do apply, and the passages cited by plaintiff have no bearing upon the facts of the instant case.

It will be noticed upon examination of the language in FPM Supp. 752–1, S3–2a(2), *supra*, that an agency "should not base an adverse action on a criminal indictment or conviction," "[e]*xcept when the agency suspends an employee indefinitely pending disposition of a criminal action.*" [Emphasis supplied.] Since plaintiff's employer here *did* suspend him indefinitely during the pendency of the criminal case, the general rule of S3–2a(2) simply had no application. Thus, it was entirely proper to predicate such indefinite suspension solely upon the fact of indictment. As the advance notice itself states, HUD reserved the right to institute a *second* adverse action, looking toward removal, should the facts disclosed by investigation have warranted that step. Moreover, we think this procedure to have been eminently fair to plaintiff. Recognizing that he might well be acquitted, the agency even-handedly rejected the "knee-jerk" approach, giving plaintiff a chance to save his job if exonerated.

■ Our conclusion in this regard is fortified by reference to other passages in FPM Supp. 752–1, upon which the employing agency obviously relied, but to which we have not been referred by the parties. FPM Supp. 752–1 S5–3b (1972) provides, in part:

b. *"Crime" provision.* (1) When there is reasonable cause to believe an employee is guilty of a crime for which a sentence of imprisonment can be imposed, the agency may give the employee less than 30 days' advance written notice. * * *.[4]

 * * * * * *

(3) * * * [A] difficulty in applying the crime provision is to determine what constitutes reasonable cause for believing that an employee is guilty. An agency cannot invoke the "crime" provision solely on evidence that the employee was arrested. However, if the agency has evidence that the employee * * * was indicted by a grand jury, then the agency would have reasonable cause for believing the employee guilty of the crime (see sample notice B–7). * * *.[5]

In S5–4, Duty Status During Notice Period, the following provisions appear:

c. *Emergency situations under subpart B.* * * *.

(2) *Use of "crime" provision.* When an agency believes an employee should not remain on the premises and can invoke the crime provision, it is better practice to shorten the notice period and process only one action—a removal or an indefinite suspension * * *. Generally, to invoke the crime provision and process a removal or indefinite suspension with a curtailed notice period an agency would:

—Notify the employee he is being put immediately in a nonduty status with pay for no longer than five calendar days.

—Give the employee notice * * * of * * * proposed indefinite sus-

---

**3.** So far as our research discloses, this question remains open to the most serious judicial doubt. *See Piccone v. United States*, 407 F.2d 866, 871–72 n. 12, 186 Ct.Cl. 752, 762 n. 12 (1969). Judge Nichol's concurring opinion in *Piccone* is most instructive on this point. 407 F.2d at 876 *et seq.*, 186 Ct.Cl. at 770 *et seq. See also Manzi v. United States*, 198 Ct.Cl. 489 (1972); *Nordstrom v. United States*, 342 F.2d 55, 59, 169 Ct.Cl. 632, 638 (1965); *Brennan v. Ace Hardware Corp.*, 495 F.2d 368, 376 (8th Cir. 1974).

**4.** This language reflects the wording of 5 U.S.C. § 7512(b)(1) (1970) and 5 C.F.R. § 752.202(c)(2) (1972).

**5.** The advance notice received by plaintiff in this case is practically identical to the one recommended and set out in the FPM at sample notice B–7.

pension pending disposition of the criminal action * * *.

* * * * * *

If the agency decides to suspend the employee and later, after the resolution of the criminal charges decides to remove him, it must initiate a new adverse action to remove the employee. * * *.

In our estimation, plaintiff's employer followed the FPM scrupulously, including adopting an advance notice of proposed indefinite suspension almost identical to that set out as an example in FPM Supp. 752–1, sample form B–7. Since we find that the Government in fact followed applicable procedural recommendations and safeguards in the FPM, we do not agree that plaintiff's indefinite suspension without pay was either unjustified or unwarranted. This much of plaintiff's claim for back pay must fail. However, in accord with the Government's concession, plaintiff is entitled to a judgment for back pay between the official date of his reinstatement, June 19, 1974, and the date of his actual return to work later in that year. To this extent only plaintiff's motion for summary judgment will be allowed.

## II

■ As noted, the Government has asserted a counterclaim under the False Claims Act, 31 U.S.C. § 231 et seq.[6] Plaintiff replies that this approach may not be considered on the merits, since any rights appertaining to the Government under that Act are time-barred by the applicable statute of limitations, 31 U.S.C. § 235 (1970):

Every suit shall be commenced within 6 years from the commission of the act, and not afterward.

---

6. 31 U.S.C. § 231 (1970) provides in part:

"Any person * * * who shall * * * cause to be made * * * or cause to be presented * * *, for payment * * * Any claim upon or against the Goverment * * * knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of * * * aiding to obtain the payment or approval of such claim, makes * * * any false * * * certificate * * * knowing the same to con-

Defendant's theory of liability is that in taking illegal payments and rendering an inflated appraisal, plaintiff knowingly caused a false, fictitious, or fraudulent claim to be made upon or against the United States within the meaning of 31 U.S.C. § 231 (1970). In defendant's view, the "act" which accrues a cause of action is the filing of the application for FHA insurance benefits by the mortgagee. Since this document was filed on February 22, 1973, and the counterclaim interposed here on May 23, 1975, defendant asserts that its claim is not barred. Plaintiff responds by maintaining that the "act" is not the filing of the claim, but that the term has reference to the alleged conduct of the person ultimately causing such a claim to be served upon the Government. As plaintiff would have it, therefore, the cause of action accrued to the Government, if at all, at the time of the alleged illegal payments. It has been observed heretofore that more than 6 years elapsed between the date of alleged bribery and the filing of the counterclaim. This dispute requires us to examine the meaning of the term "act" as used in 31 U.S.C. § 235. Whatever its meaning, this event precipitates immediate accrual of the Government's cause of action enumerated in section 231, requiring the claim to be filed within 6 years thereof.

The authorities relevant to this question seem to fall into three categories: (1) cases holding that the "act" does not occur until actual filing of a claim against the Government; (2) a decision stating that the cause of action does not accrue until the insured loan goes into default; and (3) a single opinion suggesting that a right of action under the False Claims Act does accrue, as plaintiff contends, upon the completion of the acts of the person sued, where such acts

tain any fraudulent or fictitious statement or entry * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act * * *." This court has subject matter jurisdiction of the counterclaim under 28 U.S.C. § 1503 (1970). *Brown v. United States*, 524 F.2d 693, 703, 207 Ct.Cl. 768, 785 (1975).

ultimately cause another to file a false, fraudulent, or fictitious claim against the Government. As to categories (1) and (2), in the case at bar, both the filing of the claim for insurance benefits and the default upon insured indebtedness occurred within 6 years next preceding the filing of defendant's counterclaims. We need decide only whether the phrase "commission of the act," as used in 31 U.S.C. § 235 (1970) and as applied to this case, requires the conclusion that defendant's False Claims Act rights accrued if at all when the plaintiff allegedly received the illegal payments. If so, the counterclaim is barred; if not, it must be remanded for trial.

Decisions indicating that the "act" for purposes of this statute is the actual filing of a false, fictitious, or fraudulent claim (presumably notwithstanding the earlier acts of another which cause such a claim to be filed) include *United States v. Ekelman & Assoc., Inc.*, 532 F.2d 545 (6th Cir., 1976); *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966); *United States v. Howell*, 318 F.2d 162 (9th Cir. 1963); *United States v. Ueber*, 299 F.2d 310 (6th Cir. 1962), and *United States v. Globe Remodeling Co.*, 196 F.Supp. 652 (D.Vt.1960) (supp. opin. 1961 at 657).[7] For our purposes we need refer only to the last of these five. In *Globe Remodeling Co.* the court said:

> The claim of a lending institution for payment on the guaranty obligation by the Federal Housing Administration is a false claim for the purposes of the False Claims Act when the guaranty obligation was induced by one or more false statements in a credit application or completion certificate. [Citation omitted.] The statute of limitations * * * for causing such a false claim to be presented for payment, commences when the claim for payment on the guaranty obligation is presented. * * *. [196 F.Supp. at 655.]

This line of decisions has the aspect of certainty in application to commend it. Yet it may be difficult to accede to the idea that a claim filed by a third party (in our case the FHA mortgage insurance beneficiary) is an "act" of a defendant whose conduct made the submission of the claim possible.

The second group of these authorities, looking to the default upon insured indebtedness rather than to the conduct of the person against whom the claim is pressed or the filing of the claim itself, is exemplified by *United States v. Goldberg*, 256 F.Supp. 540 (D.Mass.1966). In that case defendant allegedly made false loan applications to various banks, on the basis of which FHA-insured loans were disbursed. Rejecting the argument that the claim accrued upon submission to the bank of a false loan application, the court said:

> * * * [T]he essence of the cause of action is that the defendant caused a claim for payment to be presented to the United States and that act occurred when the defendant defaulted on the loans. This conclusion is reinforced by the Supreme Court's holding in *United States v. McNinch* [citation omitted] that until there has been a demand for money on the public treasury there is no claim within the scope of the False Claims Act. Consequently, I rule that the "act" from which the statute runs was the default, not the filing of false [loan] applications, and that the action is timely. * * *. [256 F.Supp. at 541–42.]

The *Goldberg* decision is more akin to the case at bar than the cases cited in category (1), involving as it does the prompting by one party of the false claim of another. It might be said with considerable logical force that until such time as a false claim or demand actually is prompted by default upon insured indebtedness, the "act" of the party being sued remains inchoate or is not committed for purposes of the statute of limitations codified at 31 U.S.C. § 235

7. We may conveniently place in a subcategory within this line of decisions two cases holding that the cause of action does not accrue until such time as the false claim against the Government is finally paid. *E.g. United States ex rel. Vance v. Westinghouse Elec. Corp.*, 363 F.Supp. 1038 (W.D.Pa.1973); *United States v. Klein*, 230 F.Supp. 426 (W.D.Pa.1964), *aff'd*, 356 F.2d 983 (3d Cir. 1966).

(1970). Only upon default can it be said with relative certainty that a false claim will be forthcoming.

Our research disclosed as well the recent decision of *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514, 44 U.S.L.W. 4078 (1976), wherein the Supreme Court selected certain language which might be thought to lend support to the position of plaintiff—that a cause of action under 31 U.S.C. § 231 accrued, if at all, at such time as illegal payments allegedly were made. Therefore, we might place this decision in a third category. However, the statute of limitations was not in issue. The Court was called upon to decide how many $2,000 forfeitures should be imposed under 31 U.S.C. § 231 where the defendant subcontractor had knowingly made three shipments of deficient electron tubes for use in the performance of one prime contract, which deficiency in quality ultimately caused the Government to pay the entire amount of 35 invoices at the full contract price presented by its prime contractor. The complaint sought 35 $2,000 forfeitures, *i.e.*, one for each invoice provided to the Government. The defendant subcontractor's position was that there could be only one $2,000 forfeiture since there was only one prime contract pursuant to which false, fraudulent or fictitious invoices were served.

A divided court (5–3), speaking through Mr. Justice Stewart for the majority, could accept neither approach. In rejecting the Government's position that fully 35 forfeitures had occurred, the Court said:

> * * * The difficulty with this position is that it fails to distinguish between the acts committed by Model [the prime contractor] and the acts committed by United [the subcontractor and defendant]. [Footnote omitted.] The distinction is a critical one, because the statute imposes liability only for the commission of acts which cause false claims to be presented. [423 U.S. at 312, 96 S.Ct. at 529, 46 L.Ed.2d at 523, 44 U.S.L.W. at 4080.]

The Court was of the opinion that three statutory forfeitures had taken place:

> A correct application of the statutory language requires, rather, that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures. In the present case United [the subcontractor and defendant] committed three acts which caused Model [the prime] to submit false claims to the Government—the three separately invoiced shipments to Model. * * * Thus, United's three shipments of falsely branded tubes to Model caused Model to submit false claims to the United States, and United is thus liable for three $2,000 statutory forfeitures representing the three separate shipments that it made to Model. [Footnote omitted.] [423 U.S. at 313, 96 S.Ct. at 529, 46 L.Ed.2d at 523, 44 U.S.L.W. at 4081.]

It is true that *Bornstein* emphasizes the culpable conduct of the person causing the submission by another of a false, fictitious or fraudulent claim to the Government. Likewise, the opinion downplays the significance of the precise number of false invoices actually filed with the Government. Nevertheless, there are at least two good reasons for which we should hesitate to extend the *Bornstein* rationale to the facts of the case before us. First, as stated, the question was not when a cause of action accrued under 31 U.S.C. § 231. The problem was how many $2,000 forfeitures should be imposed. Yet the second reason is the most forceful of all. If a cause of action accrues to the Government in this case at the time of the alleged bribe and fraudulent reappraisal, it would be quite possible that in future cases Government claims under the False Claims Act could become time-barred before any demand had been made upon the Government at all or before the Government learned of the fraud. As we see it, assuming arguendo that plaintiff is guilty of the acts alleged, to a legal certainty it cannot be said that he caused any false claims whatever to be served on the Government at least until the obligor with respect to Government-insured

indebtedness defaulted thereon. Default would not necessarily occur within 6 years of the inflated reappraisal. It is inconceivable to us that Congress intended to allow a false claimant to insulate himself from all liability merely by forestalling the time of filing such a claim until 6 years after the alleged fraudulent acts which make the filing possible. Yet such consequences would be the product of the holding plaintiff now seeks.

At the earliest, we think the Government's claim accrued at the time of the obligor's default. Since this event occurred less than 6 years prior to the filing of the Government's counterclaim it is not barred. We leave for another day the question of whether the cause of action accrues upon default or upon later filing of the application for insurance benefits. We hold that, in this case, the Government's cause of action did not accrue at the time of the alleged illegal payments to plaintiff.

A word must be added respecting defendant's affirmative defense of setoff. This defense charges plaintiff with deceit arising out of the same conduct alleged in the first counterclaim. Defendant concedes that this defense sounds in tort and relates to alleged conduct not germane to plaintiff's main action (for back pay), and as such, would encounter the 3-year time bar of 28 U.S.C. § 2415(b) (1970) [8] if pressed *other* than by way of offset. Plaintiff's motion to dismiss this affirmative defense must fail, inasmuch as 28 U.S.C. § 2415(f) (1970) [9] specifically authorizes defendant to assert by setoff its tort claim, in an amount not to exceed any recovery available to plaintiff.

To this extent as well, plaintiff's motion must fail.

### III

The Government's second counterclaim demands judgment in the amount of all bribes, kickbacks, secret emoluments, and other illegal payments allegedly made to plaintiff in connection with the inflated appraisal of the New York property. The counterclaim states a legally sufficient common law right of action recognized by the Supreme Court long ago:

> \* \* \* The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity or benefit in violation of his duty, or acquires any interest adverse to his principal without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received. [*United States v. Carter*, 217 U.S. 286, 306, 30 S.Ct. 515, 520, 54 L.Ed. 769, 775 (1910).]

Jurisdiction of such a counterclaim undoubtedly attaches in this court under 28 U.S.C. § 1503 (1970).[10]

Once again we are called upon by plaintiff's reply and motion to decide the ultimate question of whether this counterclaim is barred by the statute of limitations. Unlike the first counterclaim, we may assume that this cause of action accrued at the time of the alleged illegal payments.

---

**8.** "Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues: \* \* \*."

**9.** "\* \* \* A claim of the United States or an officer or agency thereof that does not arise out of the transaction or occurrence that is the subject matter of the opposing party's claim may, if time-barred, be asserted only by way of offset and may be allowed in an amount not to exceed the amount of the opposing party's recovery."

**10.** This statute provides:

"The Court of Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court."

The intent of this section is to permit the Government to have all controversies between it and the plaintiff litigated in one forum, once and for all. *Cherry Cotton Mills v. United States*, 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946).

We have seen as well that 6 years passed between the dates of alleged payments and the filing of the counterclaim. Nonetheless, this counterclaim does not encounter the bar of the statute of limitations:

> (a) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States * * * which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues * * *. [28 U.S.C. § 2415(a) (1970).]

28 U.S.C. § 2416 (1970) reads in part:

> For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which—
>
> * * * * * *
>
> (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances; * * *.[11]

 We think that the obligation of an agent of the Government to account to his principal for a payment illegally received, since premised upon an obligation created by law, and not upon the apparent mutual consent of the parties, derives from a contract implied in law within the meaning of 28 U.S.C. § 2415(a) (1970). *Cf. J. C. Pitman & Sons v. United States*, 317 F.2d 366, 368, 161 Ct.Cl. 701, 705 (1963); *see*

Restatement of Contracts 2d, § 5, comment *b* (Tent. Drafts Nos. 1–7, 1973); 1 S. Williston, Contracts § 3A at 14 (1957 ed.).[12] Moreover, defendant has placed before us an uncontroverted affidavit to the effect that not until March 23, 1970, were allegations received by the United States Attorney for the Eastern District of New York indicating the presence of a scheme by a mortgage company calculated to defraud the United States through false information on FHA mortgage insurance applications. Therefore, not until that date did the Government have actual knowledge of facts tending to indicate the presence of alleged fraud. Nothing in the record indicates that at any time prior to March 23, 1970, facts were reasonably available to defendant which would have provided constructive notice of such alleged illegal payments. To controvert the assertions of fact contained in an affidavit filed in support of a motion for summary judgment, or in opposition thereto, the party involved may not rely upon bare denials but must adduce by affidavits or otherwise evidence tending to place the disputed matter genuinely in issue. Rule 101(f); *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 1341, 202 Ct.Cl. 1, 15 (1973). On the basis of the uncontroverted affidavit and exhibits before us we conclude that the running of the limitation period set down in 28 U.S.C. § 2415(a) (1970) was tolled at least until March 23, 1970, under 28 U.S.C. § 2416(c) (1970), when facts first became known to responsible officials charged with investiga-

---

**11.** Plaintiff's contention that 28 U.S.C. § 2501 (1970) applies to counterclaims by the United States must be rejected. *Dugan & McNamara, Inc. v. United States*, 124 F.Supp. 650, 130 Ct.Cl. 603 (1954).

**12.** We are not unmindful of the principle that a plaintiff may not recover against the United States under the Tucker Act, 28 U.S.C. § 1491 (1970), where the claim is based solely on a contract implied in law. *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643, 644 (1925); *J. C. Pitman & Sons v. United States*, 317 F.2d 366, 368, 161 Ct.Cl. 701, 704 (1963). This rule derives from judicial construction of the Tucker Act, however, and our research has disclosed no similar authority which would bar recovery in favor of the Unit-

ed States upon this sort of implied contract where it chooses to interpose it by way of counterclaim under 28 U.S.C. § 1503 (1970). Indeed, one should hesitate to espouse such a view in light of the expansive language of the latter jurisdictional statute (*see* note 8, *supra*). In similar situations we have recognized that the Government may assert counterclaims in this court pressing causes of action of which we would have no subject matter jurisdiction, were the same claims placed before us by a plaintiff. *See, e.g., Continental Management, Inc. v. United States*, 527 F.2d 613, 208 Ct.Cl. —— (1975), wherein the Government's counterclaim, sounding in tort, was sustained even though the Tucker Act gives us no jurisdiction to hear tort claims filed here by plaintiffs.

tion of possible illegal payments to plaintiff. Therefore, the second counterclaim must be remanded for trial.

## IV

In summary and conclusion, plaintiff's motion for summary judgment is allowed only to the extent that he is entitled to judgment for back pay commencing upon the date of his official reinstatement June 19, 1974, and ending with the date of his actual return to work on November 5, 1974. Defendant's motion for summary judgment is granted as to plaintiff's claim for back pay for the period of indefinite suspension, April 6, 1972—June 19, 1974, and as to this claim the petition is dismissed. Upon further consideration of plaintiff's motion we find that insofar as it seeks dismissal of defendant's first affirmative defense and first and second counterclaims, it should be and it is denied. Judgment for plaintiff is subject thereto and the case is ordered remanded to the trial judge pursuant to Rule 131 for further proceedings consistent with this opinion.

NICHOLS, Judge (concurring in part, dissenting in part):

This pay case presents us with interesting puzzles. Though first inclined the other way, I am persuaded by Judge Bennett's able analysis that the Civil Service Commission does not disapprove, but in fact recommends, that a person indicted for the reason Mr. Jankowitz was here should be suspended because of the indictment until the outcome of his trial. This assumes, of course, that the offense charged had such a connection with the job situation that it would be irrational to expect useful or dependable work from t he employee until the charges were resolved. Suspension being a proper course to have taken, the unsuccessful outcome of the trial, from the Government's point of view, does not make the suspension from the beginning an "unjustified or unwarranted personnel action". To hold otherwise would read into the statute what is not in it.

I have more difficulty than he does with *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). This case construes the word "act" in the False Claims statute to mean the false assertion of the initial violator. This is for the purpose of counting the number of "acts" penalized at $2,000 per "act", when the misstatements are passed onto the Government by a third party who may have been innocent. In *Bornstein* there were three false invoices by Bornstein's company, a subcontractor, to the prime contractor, causing thirty-five by it to the Government. Held, by the majority, there were three $2,000 "acts", not thirty-five. We must here construe the limitation provision which is very much in *pari materia* and bars suit for the forfeitures after six years from the "acts". How can we give the same word "act" a different meaning, employing ordinary and accepted techniques of statutory construction?

The only persuasive reason is that the interpretation consistent with *Bornstein* produces an absurd result which Congress could not have intended. It would cause limitations to run on some $2,000 forfeitures before the Government's claim even accrued. These results would occur in few cases and it is possible to argue, though not very persuasively, that Congress intended them. Plaintiff's counsel did so argue.

I think the reasons not sufficient for a non-literal interpretation. It is true, in everybody's favorite Supreme Court decision, *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), it is said that statutes may be construed contrary to their literal language to avoid absurd results, contrary to the manifest intention of Congress. P. 459, 12 S.Ct. p. 512, 36 L.Ed. p. 228. But this is said in course of relieving the well-meaning but technically guilty church from a civil penalty. The authorities cited there deal with that situation. Thus at 459, 12 S.Ct. at 512, 36 L.Ed. at 228 Lord Coke is quoted:

\* \* \* "Acts of Parliament are to be so construed as no man that is innocent or

free from injury or wrong be, by a literal construction, punished or endamaged."

Here we are invited to fix up defective language to assess a penalty, not to relieve from one. In the very *Bornstein* decision that makes us the trouble, the Court notes at fn. 8, 423 U.S. p. 313 at fn. 8, 96 S.Ct. p. 529 at fn. 8, 46 L.Ed.2d p. 523, that we are actually construing a criminal statute and that such provisions:

"* * * must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions." (Citing *United States v. McNinch*, 356 U.S. 595, 598, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001, 1004 (1958).)

I read this to mean that a False Claims Act penalty must meet a double test. The assessment must be within the literal language *and* it must be within the Congressional intent as judicially conceived. Therefore, the designated culprit is not liable for the penalty if the literal language does not cover the case, even though Congress may have wanted to cover it and thought it had done so. I am constrained to hold that limitations on the $2,000 claims have run.