UNITED STATES of America, Plaintiff,

v.

Peter D. VANOOSTERHOUT, Defendant.

Civ. A. No. 94–1911.

United States District Court,
District of Columbia.

Aug. 31, 1995.

Patricia L. Hanower, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, for plaintiff.

Gerald A. Messerman, Philip S. Kushner, Duvin, Cahn, Barnard & Messerman, Cleveland, OH, for defendant.

## OPINION

ROBERTSON, District Judge.

The government seeks to recover from defendant Peter D. Vanoosterhout monies paid out under Small Business Administration guaranties when River Capital Corporation, a small business investment company funded by SBA-backed debentures, defaulted on its obligations. Vanoosterhout, who was president and a director of River Capital, is alleged to have been personally responsible for the submission to SBA of financial statements that falsely stated River Capital's financial position. The false statements were allegedly made in order to obtain SBA-guaranteed financing, avoid revealing events of default, and steer SBA away from prompt collection action.

The government's original five-count complaint invokes the False Claims Act, 31 U.S.C. § 3729, and the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833(a) ("FIRREA"). Before me is defendant's motion to dismiss, which asserts, *inter alia,* that the False Claims Act counts are barred by the statute of limitations and that the FIRREA counts will not lie because River Capital was not a federally insured financial institution. For reasons set forth in this memorandum, the defense motion will be treated as a motion for summary judgment, F.R.Civ.P. 12(b), and granted.

## Facts

River Capital was incorporated in 1982 and licensed by the SBA under § 301(d) of the SBIC Act, 15 U.S.C. § 681. Its financial statement for the year ending December 31, 1986, submitted to SBA, showed total assets in the amount of $34,155,290 and SBA debt of $22 million. In February 1987, River Capital received $4 million in SBA-guaranteed debenture financing. On August 3, 1987, River Capital applied to SBA for an additional $2.5 million of guaranteed debenture financing, certifying that there had been no adverse change in its financial condition since December 31, 1986. The requested additional financing was provided on September 29, 1987. On March 3, 1988, River Capital submitted its annual financial statement for the year ending December 31, 1987, reporting assets in the amount of $39,439,283 and SBA debt of $25,500,000.

By letter dated June 1, 1988, SBA instructed River Capital to take action within 30 days to correct what SBA had identified as repeated and consistent violations of SBA's regulatory and statutory "over-line limitations." River Capital not only failed to correct its over-line violations but, on July 1, 1988, it defaulted on interest payments due to SBA in the total amount of $346,847.10. On July 28, 1988, SBA auditor John LoPata completed an SBA audit of River Capital for the 17–month period ending April 30, 1988. The SBA audit concluded that "[t]he independent accountant's report as of December 31, 1986, and 1987, were ... unreliable and misleading." [LoPata's report at 4]. On August 1, 1988, River Capital defaulted upon

a principal payment due to SBA in the amount of $158,546 (Complaint, ¶¶ 31, 32).

The established SBA procedures for the acceleration of debentures and the making of SBA guarantee payments in the event of default were set forth in offering circulars issued with each series of SBA-guaranteed "participation certificates."[1] The $2.5 million debenture financing received by River Capital on September 29, 1987, was part of Series SBIC 1987–C, for which the offering circular was dated September 23, 1987. According to that offering circular (p. 1):

> The principal amount of a Debenture shall become immediately due and payable upon the occurrence of an event of default by an SBIC and subsequent acceleration by SBA of the Debenture (an "Acceleration Event"). Pursuant to its Guarantee, SBA will make a payment of 100% of the principal amount of the Debenture together with interest accrued to the Payment Date next following the Acceleration Event (an "Acceleration Payment").

SBA had discretion to declare an acceleration of an SBIC debenture upon River Capital's default in the payment of principal or interest thereon or upon the failure of River Capital to cure an event of default. If SBA decided to accelerate, its procedures called for it to "transfer the SBIC from operating status into liquidation status in order to protect the creditor position of SBA." The offering circular went on to provide (p. 9):

> Upon a determination by SBA to transfer an SBIC into liquidation status, jurisdiction over the SBIC is transferred to the Office of Portfolio Management whereupon the SBIC is considered in liquidation status. At this point, an acceleration letter is sent to the SBIC citing violations and defaults, making demand for payment of the accelerated obligations and advising the SBIC that it has been transferred to liquidation status. SBA will make a Guarantee Payment of the outstanding principal and accrued interest with respect to such SBIC Debenture to the next scheduled Payment

Date on or before the next scheduled Distribution Date for such Payment Date.

Following River Capital's defaults on July 1 and August 1, 1988, and pursuant to its own procedures, SBA acted formally on August 24, 1988, to place River Capital in liquidation status. Also pursuant to its procedures, SBA sent an acceleration letter to River Capital on September 1, 1988, declaring all of its indebtedness immediately due and payable, demanding payment in full, and advising that River Capital had been transferred to liquidation status on August 24. Further pursuant to its procedures, SBA made a guarantee payment to Chemical Bank, as trustee, on September 9, 1988; that payment was made by operation of SBA's procedures and without any claim, demand or application on the part of Chemical Bank.

River Capital filed for protection under Chapter 11 of the Bankruptcy Code on August 24, 1989. The government subsequently initiated criminal proceedings against Vanoosterhout. Three separate indictments were returned against him, in June 1992, October 1992, and May 1994, in the United States District Court for the Northern District of Ohio. The indictments charged Vanoosterhout with crimes that related directly to River Capital and its SBA financing and included all of the allegations of wrongdoing set forth in the complaint now before me.

For reasons that do not appear of record, all three indictments were dismissed on August 24, 1994. The government filed this civil action on August 31, 1994.

*Discussion*

### *The False Claims Act Counts*

■ Counts One and Five are both premised on River Capital's August 3, 1987 submission of an allegedly false statement certifying the continuing correctness of an earlier statement of River Capital's financial position as of December 31, 1986, and both counts seek the recovery of the proceeds of River Capital's $2.5 million debenture financing provided as part of Series SBIC 1987–C under the September 23, 1987 offering circular.

---

1. SBA-guaranteed debentures issued by River Capital and other SBIC's were bought by investment banks and "pooled." Fractional undivided interests in the pooled debentures were sold to the public as "participation certificates."

In Count One, the government charges that Vanoosterhout knowingly made or used that allegedly false statement, or caused it to be made or used, "to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(2). In Count Five, the government charges that the same statement was the overt act of a conspiracy between Vanoosterhout and River Capital to defraud the government "by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3).

An action for violation of the False Claims Act may be brought by the Attorney General under 31 U.S.C. § 3730(a) or by private persons under the *qui tam* provisions of 31 U.S.C. § 3730(b). In either case:

"A civil action under section 3730 may not be brought—

(1) more than 6 years after the date on which the violation of section 3729 · is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last." 31 U.S.C. § 3731(b)

It is the 6–year statute that applies to this case. It is assumed, for purposes of this motion, that Vanoosterhout committed the alleged violations of 31 U.S.C. § 3729. In order to determine when the statute of limitations began to run, it is necessary to decide exactly what the violations were and when they were committed.

The analysis begins with *United States v. McNinch*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). The Supreme Court decided in that case that an application for credit insurance under a federal program was not a "claim" within the meaning of the False Claims Act. The Court quoted with approval the observation of the Third Circuit

in *United States v. Tieger*, 234 F.2d 589, 591, *cert. denied* 352 U.S. 941, 77 S.Ct. 262, 1 L.Ed.2d 237 (1956), that "the conception of a claim against the government normally connotes a demand for money or some transfer of public property" and reasoned on the facts before it that the federal agency "in agreeing to insure a home improvement loan ... disburses no funds nor does it otherwise suffer immediate financial detriment." Because there was no default in the *McNinch* case, however, the Court expressed no view as to whether "a lending institution's demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a 'claim' covered by the FCA." 356 U.S. at 598 n. 6, 78 S.Ct. at 952 n. 6.

*McNinch* has been understood to mean that, in the context of an insurance or guarantee program, the making of the false statement only establishes an "inchoate" violation of the False Claims Act, one that does not ripen "until such time as a false claim or demand actually is prompted by default upon insured indebtedness," *Jankowitz v. United States*, 533 F.2d 538, 545, 209 Ct.Cl. 489 (1976). But whether it is the default, the demand for reimbursement or the actual payment that completes the violation for statute of limitations purposes has been less than clear.[2] There are no D.C. Circuit cases on point.

The government acknowledges that the "usual" rule emerging from the *McNinch* line of cases is that the statute of limitations "begins to run when the bank or other third party or other intermediary presents the claim to the government for payment under its guarantee, rather than the date of false statement or the date of default." The government argues, however, that the "usual" rule does not apply in the case at bar because the government's obligation to make guarantee payments on the River Capital debentures arose, and the payments were made, "without formal demand or the presentation of a claim" and simply by operation of the SBA's own rules. Therefore, the government argues, "the statute of limitations

---

**2.** The *Jankowitz* court declined to decide whether the limitations period began to run at default or upon submission of the insurance claim, finding

that both events occurred less than six years before suit was filed. 533 F.2d at 538.

does not begin to run until the government actually *pays* the claim."

The government's cases do not support the proposition for which they are cited. *Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1157 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993), is factually distinguishable and deals with the *qui tam* provisions of the False Claims Act. It contains no analysis of the government's proposition and cites only *Blusal Meats, Inc. v. United States*, 638 F.Supp. 824 (S.D.N.Y.1986). The opinion in *Blusal Meats* announces, again without analysis, that "the six-year limitations period under the False Claims Act begins to run on the date the claim is filed or, if the claim is paid, on the date of the payment." *Id.* at 829. That ambiguous holding, in turn, recites its reliance upon three cases: *Jankowitz v. U.S.*, *supra* at 545, whose holding appears to favor default or presentment over payment as the trigger for the statute of limitations; *U.S. v. Cripps*, 451 F.Supp. 598, 600 (E.D.Mich.1978), where Chief Judge Kennedy found it "clear that the statute of limitations period began to run on the date each voucher was presented to HUD for payment"; and *U.S. v. Klein*, 230 F.Supp. 426 (W.D.Pa.1964), *aff'd* 356 F.2d 983 (3d Cir.1966), whose ambiguous holding is that "until the Government *had to pay* under its guarantee program, the statute did not begin to run." (emphasis added).

A recent decision of the First Circuit provides analysis that is both helpful and persuasive. *U.S. v. Rivera*, 55 F.3d 703 (1st Cir.1995), was a False Claims Act case brought against officers of a hospital in Puerto Rico for fraudulently diverting the proceeds of a federally insured mortgage loan. The hospital defaulted on the loan and filed a bankruptcy petition. The lender declared the loan in default and presented HUD with a formal application for insurance benefits. The False Claims Act suit was filed more than six years after all of these events—but it was filed six years to the day after the lender formally assigned its mortgage on the hospital's property to the government, thereby complying with a condition precedent to HUD's obligations to pay. The district court found that the action was timely filed because the government's obligation to pay did not arise until the mortgage was assigned. 839 F.Supp. 92, 95 (D.P.R.1993).

The First Circuit reversed. After reviewing the *McNinch* decision and its progeny, the court articulated the "theory" that, for purposes of 31 U.S.C. § 3731(b), the violation was committed, and the statute began to run, whenever the lender "can properly be said to have presented its insurance claim to the government." The court then concluded that the lender's claim, even if not perfected by the assignment of the mortgage, amounted to a "demand for money" that would induce the government to disburse funds or to "otherwise suffer immediate financial detriment," referring again to the *McNinch* opinion. *Id.* at 709. The First Circuit's extensive analysis concludes: "Thus, in deciding whether a given false statement is a claim or demand for payment, a court should look to see if, *within the payment scheme* the statement has practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." *Id.* at 709 (emphasis added).

Application of the First Circuit's analysis to the facts of the instant case, including particularly the payment scheme reflected by the offering circular, leads to the conclusion that *the SBA's own act of transferring River Capital to a liquidation status* operated as the "claim" or "demand for money" required by the *McNinch* decision and its progeny. That act took place on August 24, 1988, which was more than six years before the instant suit, including Counts One and Five, was filed. Accordingly, the False Claims Act statute of limitation bars those two counts.

█ Count Two is based on 31 U.S.C. § 3729(a)(7) and requires a different, but much simpler, analysis of the statute of limitation defense. For this count, the false statement itself is the "violation," which is charged as the knowing use of "false statements or records to conceal, avoid or decrease an obligation to pay or transmit money or property to the SBA." The relevant date is March 3, 1988—the day River Capital submitted its financial statements for the year ended December 31, 1987. The statute of limitations began to run at that time.

**30**

Count Two was filed more than six years later and is barred.

### The FIRREA Counts

 Counts Three and Four of the original complaint and Count Six of the government's amended complaint[3] seek civil penalties under 12 U.S.C. § 1833a, for violations of, or conspiracies to violate, three designated sections of Title 18 of the United States Code.

The predicate act charged in Count Three is a violation of 18 U.S.C. § 287, which is the criminal analog of the Civil False Claims Statute, 31 U.S.C. § 3729. The predicate act charged in Count Four is a violation of 18 U.S.C. § 1001, the general criminal false statement provision. FIRREA civil penalties apply only to those violations of § 287 and § 1001 that "affect ... a federally insured financial institution." 12 U.S.C. § 1833a(c). River Capital was not a federally insured financial institution. Punitive statutes, such as FIRREA, are to be narrowly construed. *See Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980); *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 956 (D.C.Cir.1990). The false claims count (Count Three) and false statements count (Count Four) are beyond the reach of FIRREA and must be dismissed.

The predicate act charged in the proposed new Count Six is a violation of 18 U.S.C. § 1014, which is *not* modified for FIRREA purposes by the requirement that a

violation affect a federally insured financial institution. This very specific statute makes it a crime knowingly to make any false statement or report or willfully to overvalue any land, property or security for the purpose of influencing in any way the action of any of a list of enumerated agencies or persons.[4] SBA is not mentioned by name and is not among the listed generic types of agencies, and it follows that the proposed Count Six could not stand even if leave were granted to file it.

\*       \*       \*       \*       \*       \*

For the above-stated reasons, defendant's motion to dismiss must be granted. An order consistent with this opinion is filed herewith.

---

3. The government lodged its amended complaint after defendant had filed a responsive pleading but failed to move for leave to file under F.R.Civ.P. 15(a). This opinion deals with the added Count Six as if it had been properly filed.

4. 18 U.S.C. § 1014 includes the "Reconstruction Finance Corporation, Farm Credit Administration, Federal Crop Insurance Corporation, Farmers' Home Corporation, the Secretary of Agriculture acting through the Farmers' Home Administration, any Federal intermediate credit bank, or any division, officer, or employee thereof, or of any corporation organized under sections 1131–1134m of Title 12, or of any regional agricultural credit corporation established pursuant to law, or of the National Agricultural Credit Corporation, a Home Loan Bank, the Federal Home

Loan Bank Board, the Home Owner's Loan Corporation, a Federal Savings and Loan Association, a Federal land bank, a joint-stock land bank, a Federal land bank association, a Federal Reserve bank, a small business investment company, a Federal credit union, an insured State-Chartered credit union, any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, any member of the Federal Home Loan Bank System, the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, or the Administrator of the National Credit Union Administration...."